136 F.3d 293
 11 NDLR P 361
 Richard SALUTE; Long Island Housing Services; Marie
Kravette, Plaintiffs-Appellants,
v.
STRATFORD GREENS GARDEN APARTMENTS, A Co-Partnership; Gerald
Monter; Elliot Monter; Holiday Management
Associates, Inc., Defendants-Appellees.
 No. 542, Docket 96-7398.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 3, 1996.
Decided Feb. 5, 1998.
 
 Richard F. Bellman, New York City (Miriam F. Clark, Lewis M. Steel, Steel Bellman Ritz & Clark, P.C., on the brief), for Plaintiffs-Appellants.
 Kenneth A. Novikoff, Uniondale, NY (Rivkin, Radler, & Kremer, on the brief), for Defendants-Appellees.
 Deval L. Patrick, Assistant Attorney General, David K. Flynn, Thomas E. Chandler, Department of Justice, Nelson A. Diaz, General Counsel, Sara Manzano, Deputy General Counsel for Civil Rights & Litigation, Carole W. Wilson, Associate General Counsel for Litigation & Fair Housing Enforcement, United States Department of Housing and Urban Development, Washington, DC, for amicus curiae United States of America.
 Donald B. Verrilli, Jr., Paul M. Smith, Sam Hirsch, Jenner & Block, Washington, DC, John P. Relman, Christine R. Ladd, Washington Lawyers' Committee for Civil Rights and Urban Affairs, Washington, DC, for amici curiae The National Fair Housing Alliance, Inc., Advocacy, Inc., The American Counseling Association, The Arc, The Bazelon Center for Mental Health Law, The California Alliance for the Mentally Ill, The Center for Public Representation, and The Disability Rights Education and Defense Fund, Inc.
 Zeva Schub, Lawyers' Committee for Better Housing, Inc., Chicago, IL, for amicus curiae Lawyers' Committee for Better Housing, Inc.
 John C. Gray Jr., Jane Greengold Stevens, Edward Josephson, Hilary Botein, Brooklyn Legal Services Corporation B, Brooklyn, NY, Helaine Barnett, Scott Rosenberg, Judith Goldiner, Linda Johnson, The Legal Aid Society, New York City, Kleo J. King, Program Counsel, Eastern Paralyzed Veterans Association, Jackson Heights, NY, for amici curiae The Center for Independence of the Disabled in New York, The Eastern Paralyzed Veterans Association, and The Legal Aid Society.
 Judge CALABRESI, dissents in a separate opinion.
 JACOBS, Circuit Judge.
 
 
 1
 Plaintiffs Richard Salute and Marie Kravette are individuals with disabilities who qualify to receive Section 8 housing assistance from the federal government, but who were unable to become tenants at Stratford Greens Garden Apartments because the landlord refuses to rent apartments to Section 8 certificate holders. Kravette and Salute, together with plaintiff Long Island Housing Services, brought suit against the owners and managers of the apartment complex (collectively "Stratford Greens"), alleging that their refusal to rent apartments to Salute and Kravette violated (i) the United States Housing Act's "take one, take all" provision, 42 U.S.C. § 1437f(t)(1)(a), and (ii) the Fair Housing Act, 42 U.S.C. § 3601-3631. Under these statutes:
 
 
 2
 (i) No landlord is required by law to accept Section 8 tenants; but (at the relevant time) the "take one, take all" provision prohibited an owner who voluntarily accepted any Section 8 tenant from rejecting others by reason of their status as Section 8 participants.
 
 
 3
 (ii) The Fair Housing Act prohibits discrimination in the sale or rental of dwellings to persons with disabilities, and expands the definition of discrimination to include a refusal to make certain reasonable accommodations needed to afford them an equal opportunity to use and enjoy a dwelling.
 
 
 4
 The district court held on summary judgment that the "take one, take all" provision was inapplicable in this case because the only Section 8 tenants at Stratford Greens were tenants who, having experienced reversals of fortune, had enrolled in the Section 8 program during their tenancy, and whom the owners had decided not to evict. The court also held that plaintiffs had failed as a matter of law to make out either a claim of disparate impact under the Fair Housing Act, or a claim under that Act's reasonable accommodations provision.
 
 
 5
 Soon after the district court issued its opinion, but prior to the briefing of this appeal, Congress repealed the "take one, take all" provision. Nevertheless, plaintiffs appeal all three of the district court's rulings, and, for the reasons set forth below, we affirm.BACKGROUND
 
 
 6
 The facts in this case are undisputed. Plaintiffs Salute and Kravette are both disabled by multiple ailments, and have been found eligible for low income housing assistance under the Section 8 housing program, established by the United States Housing Act of 1937, as amended by The Housing and Community Development Act of 1974.
 
 
 7
 The Section 8 program is administered by the Department of Housing and Urban Development ("HUD"). When a Section 8 certificate holder finds an apartment that meets the applicable rent guidelines, and the landlord has agreed to participate in the Section 8 program, the tenant pays in rent an amount not exceeding 30% of the tenant's gross income, and the government contracts with the private landlord to pay a subsidy equal to the remainder of the market rent. Participation by landlords is voluntary; they lawfully may refuse to accept applications from Section 8 beneficiaries.
 
 
 8
 Stratford Greens is a 365-unit apartment complex in Suffolk County, New York, managed by defendant Holiday Management Associates, of which Gerald Monter is the CEO. Monter's practice at Stratford Greens has been to refuse to accept applications from prospective tenants who are receiving Section 8 assistance, because (as he explains) he does not want to get involved with the federal government and its rules and regulations. Stratford Greens has never accepted a tenant who, at the time of application, was a Section 8 participant. On four occasions over the past 15 years, however, Monter has agreed to accept Section 8 payments on behalf of tenants already residing at Stratford Greens. On each occasion, the tenant became a Section 8 certificate holder during the tenancy, and Monter agreed to take the Section 8 subsidies rather than evict. Two of these tenants still reside at Stratford Greens and both are still Section 8 participants.
 
 
 9
 Salute received a Section 8 certificate in 1993, found an apartment in Stratford Greens that met his needs, but was turned down because he was a Section 8 participant. Kravette had been a Section 8 tenant in a two-bedroom apartment from 1990 to 1995, but was forced to find a one-bedroom apartment after her son moved out. Like Salute, she found an appropriate apartment at Stratford Greens, and was turned down for the same reason.
 
 
 10
 This action was originally commenced in October 1993 by Salute and Long Island Housing Services. Their complaint alleged that the defendants had violated the Fair Housing Act, 42 U.S.C. § 3601-3631, by discriminating against a person with disabilities, and by refusing to make "reasonable accommodations" to facilitate the rental. The district court denied defendants' original motion to dismiss in April 1994.
 
 
 11
 After learning through discovery that defendant had accepted Section 8 certificates from four tenants, plaintiffs filed an amended complaint in February 1995, raising a claim of discrimination under the United States Housing Act's "take one, take all" provision, 42 U.S.C. § 1437f(t)(1)(A). On May 9, 1995, plaintiffs moved for leave to file an amended and supplemental complaint adding Kravette as a party, and sought a preliminary injunction permitting her to occupy an apartment at Stratford Greens pending the outcome of this case. On May 26, 1995, Judge Gleeson concluded that Kravette had shown a likelihood of success on the merits of her claim under the "take one, take all" provision, and granted the injunction.
 
 
 12
 Plaintiffs and defendants cross-moved for summary judgment on liability. On March 21, 1996, the district court issued a memorandum and order granting the defendants' motion and denying the motion of the plaintiffs. See Salute v. Stratford Greens, 918 F.Supp. 660 (E.D.N.Y.1996). The court engrafted an exception onto § 1437f(t)(1)(A), holding the provision inapplicable where the only Section 8 holders in the development are existing tenants who acquired Section 8 status during their tenancy. Id. at 666. The court also held that defendants (i) had not violated the reasonable accommodations provision of the FHA, and (ii) had not violated the FHA under a disparate impact analysis. Id. at 667-68. Judgment was entered on March 22, 1996, but the district court stayed any action by defendants with respect to the termination of Kravette's tenancy pending resolution of this appeal.
 
 
 13
 On April 26, 1996, after entry of judgment but before briefing and oral argument of this appeal, Congress repealed the "take one, take all" provision. See Pub.L. No. 104-134, § 203(a), (d), 110 Stat. 1321 (1996) (effective for fiscal year 1996); Pub.L. No. 104-204, § 201(e), 110 Stat. 2893 (1996) (effective for fiscal year 1997).
 
 DISCUSSION
 
 14
 A grant of summary judgment is reviewed de novo. Briones v. Runyon, 101 F.3d 287, 291 (2d Cir.1996). Summary judgment is proper only where no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996). However, we may affirm the district court on any ground that finds support in the record. United States v. International Bhd. of Teamsters, 948 F.2d 1338, 1347 (2d Cir.1991).
 
 
 15
 A. Claims under the "take one, take all" provision of the United States Housing Act, 42 U.S.C. § 1437f(t)(1)(A).
 
 
 16
 Now repealed, 42 U.S.C. § 1437f(t)(1)(A) provided:
 
 
 17
 (1)No owner who has entered into a contract for housing assistance payments under this section on behalf of any tenant in a multifamily housing project shall refuse--
 
 
 18
 (A)to lease any available dwelling unit in any multifamily housing project of such owner ... to a holder of a certificate of eligibility under this section a proximate cause of which is the status of such prospective tenant as a holder of such certificate, and to enter into a housing assistance payments contract respecting such unit.
 
 
 19
 In effect, this section prohibited owners who participate in the section 8 program from refusing to rent to people because they are Section 8 certificate holders.
 
 
 20
 The district court concluded that it could "appropriately engraft an exception onto the 'take one, take all' provision," Salute, 918 F.Supp. at 664, so that it would not apply if "a landlord's only Section 8 participation has been the acceptance of such payments on behalf of existing tenants who became Section 8 tenants during their tenancy." Id. at 666. The court reasoned that the literal application of § 1437 to this case, as sought by plaintiffs, would disserve the goal of the Section 8 program by provoking the eviction of persons who qualify for certificates, without advancing any purpose of the "take one, take all" provision. Id. at 664.
 
 
 21
 We hold that the district court's exception to the (now repealed) § 1437f(t) was properly drawn, and therefore reject plaintiffs' contention on appeal that the district court's ruling was improper and inappropriate. Courts may adopt a restricted rather than the literal or usual meaning of a statute "where acceptance of that [literal] meaning would lead to absurd results or would thwart the obvious purpose of the statute." Helvering v. Hammel, 311 U.S. 504, 510-11, 61 S.Ct. 368, 371-72, 85 L.Ed. 303 (1941) (emphasis added) (citations omitted). The plain meaning of a statute may not be controlling in those rare cases where "literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." Tomka v. Seiler Corp., 66 F.3d 1295, 1313 (2d Cir.1995). This exception to the normal rule "is particularly pertinent when construing a recent amendment to a complex statute that produces an unexpected result and when there is strong reason to doubt that Congress intended that result." Lewis v. Grinker, 965 F.2d 1206, 1215 (2d Cir.1992).
 
 
 22
 The clear purpose of § 1437f(t) was to prevent landlords from picking and choosing from the pool of Section 8 applicants who apply to rent apartments, and thereby to promote access to decent and affordable housing for lower income households. See H.R. No. 100-122(I) at 32, 53 (1987), reprinted in 1987 U.S.C.C.A.N. at 3348, 3369. We concur in Judge Gleeson's conclusion that literal application of the statute in this case would make little sense, and adopt his observations on the subject:
 
 
 23
 It would create a powerful incentive for landlords who have chosen not to participate in the Section 8 program to evict tenants who become indigent and eligible for the program during their tenancy. Thus, at the exact moment when such tenants may be most deserving of--and most in need of--compassion from their landlords, the law would discourage it by telling the landlord that it would become a full-fledged Section 8 participant if the tenant were not evicted. In addition, in situations like the one before me, where a non-participating landlord has already made the decision not to evict, a literal application of Section 1437f(t) would create a strong incentive for the landlord to get rid of such tenants when their leases expire, a cumbersome but lawful option for the landlord.
 
 
 24
 Salute, 918 F.Supp. at 664.
 
 
 25
 We agree that Congress could not have intended in enacting § 1437f(t) to create incentives for the eviction of the people the law was drawn to protect. That would be an "absurd result" both in terms of the purposes of § 1437f(t) and the overarching purposes of housing rights statutes in general.[1] Considering that landlords have a statutory right to avoid Section 8 participation, and that landlords such as Monter and Stratford Greens will elect non-participation in order to avoid red tape and the other coils of government, a literal application of the "take one, take all" provision would have the effect of transforming people who (i) qualify for Section 8 certificates and (ii) have homes, into people who (i) qualify for Section 8 certificates and (ii) are homeless.
 
 
 26
 The district court also pointed out that a decision in plaintiffs' favor would punish Stratford Greens for its compassionate unwillingness to evict by forcing them into a "marriage with the government," which would include "required contracts with HUD, the regulations regarding security deposits, and the cumbersome process of terminating leases." Id. at 665. The court concluded that Congress had failed to anticipate these adverse consequences, and drew support from the "numerous legislative efforts ... to repeal the 'take one, take all' provision ... to minimize the burdens of Section 8 participation in order to make the program more attractive to landlords." Id.
 
 
 27
 Now that Congress has actually repealed "take one, take all," one could say that it was repealed to avoid a misinterpretation that could result in evictions of persons that Congress is solicitous to protect, a view that would support our holding. We recognize that one could also say that it was repealed because that effect would flow from the proper reading of the statute, but in any event, repeal assures that our reading does no violence to any clearly expressed congressional intent.
 
 
 28
 In the end, we think the "take one, take all" provision is best read and understood in tandem with the voluntary nature of the Section 8 program, the congressional intent to secure residence for covered persons, and the goal of avoiding discrimination among classes of Section 8 beneficiaries. We therefore hold that the district court's exception was properly drawn, and affirm the district court's conclusion that § 1437f(t) is inapplicable when a landlord's only Section 8 participation has been the acceptance of payments on behalf of existing tenants who became Section 8 certificate holders during their tenancy.
 
 
 29
 In any event, it is very far from clear that plaintiffs would have had a viable claim under § 1437f(t) even if such an exception were improper. Before we could consider such a claim, we would be required to resolve close questions concerning the effect of § 1437f(t)'s repeal, and as to whether a private cause of action for damages is (or was) maintainable under the statute.
 
 
 30
 It is clear that plaintiffs cannot now obtain any injunctive relief pursuant to the repealed § 1437f(t), and plaintiffs concede as much.[2] As to plaintiffs' claim for damages, we note that section 1437f(t) does not expressly grant a private right of action in favor of Section 8 certificate holders, which would mandate consideration of whether such a right should be implied in the statute. That determination would require consideration of the factors set forth in Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), by the dim light of § 1437f(t)'s sparse legislative history.[3] And even if we were to imply a private right of action, we would then be faced with the analytically distinct question of whether a monetary damages remedy is available in a suit brought pursuant to this implied right. See Franklin v. Gwinnett County Pub. Schools, 503 U.S. 60, 69, 112 S.Ct. 1028, 1034, 117 L.Ed.2d 208 (1992); Davis v. Passman, 442 U.S. 228, 239, 99 S.Ct. 2264, 2273-74, 60 L.Ed.2d 846 (1979). This question would in turn require us to resolve whether the general rule that federal courts may award all appropriate relief should in this case "nevertheless yield[ ] where necessary to carry out the intent of Congress or to avoid frustrating the purposes of the statute involved." Guardians Ass'n v. Civil Serv. Comm'n of the City of New York, 463 U.S. 582, 595, 103 S.Ct. 3221, 3229, 77 L.Ed.2d 866 (1983) (plurality opinion).[4]
 
 
 31
 We also have severe doubts as to plaintiffs' theory of injury and damages--that in seeking to use their certificates at Stratford Greens, they were third party beneficiaries to the contract between the defendants and the Housing Authority. At this point, we note only that such a theory has little if any support in the law, and might severely discourage landlord participation in the Section 8 program by creating an open-ended liability for landlord-participants. Finally, we note the acknowledgement by plaintiffs' counsel at oral argument that Kravette may very well have suffered no damages.
 
 
 32
 B. Claims under the "Reasonable Accommodations" Provision of the Fair Housing Act, 42 U.S.C. § 3604(f)(3)(B).
 
 
 33
 The Fair Housing Amendments Act of 1988 ("FHAA") extended the Fair Housing Act's principle of equal opportunity in housing to individuals with handicaps. The Act makes it unlawful,[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of that person.
 
 
 34
 42 U.S.C. § 3604(f)(2)(A). Under the FHAA, discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B) (emphasis added). Thus, if the reasonable accommodations provision is triggered, a defendant can be required to incur "reasonable costs" to accommodate a plaintiff's handicap, "provided such accommodations do not pose an undue hardship or a substantial burden." Shapiro v. Cadman Towers, Inc., 51 F.3d 328, 335 (2d Cir.1995) (emphasis added).
 
 
 35
 Salute and Kravette contend that the defendants' refusal to reasonably accommodate them by accepting their Section 8 certificates violated the FHAA. This argument presents at least two questions under the statute: (A) Is a landlord's participation in the Section 8 program an accommodation to the plaintiffs' handicaps within the meaning of the statute? (B) If so, is such an accommodation a reasonable one that the landlord is therefore required to make?
 
 
 36
 The district court's opinion was premised largely on the ground that an accommodation requiring Stratford Greens to accept Section 8 applicants would effect "a fundamental alteration of its rental policies," would thus impose a substantial burden, and is therefore not required under the FHAA. Salute, 918 F.Supp. at 667. The burdensomeness of landlord participation, the court noted, was confirmed by the then "current efforts by HUD to amend § 1437 to make Section 8 a more landlord-friendly program." Id. Because the district court held that it would be unreasonable to require Stratford Greens to shoulder the burdens of Section 8, and we agree, we start our review there, and consider later the more fundamental question of whether participation in Section 8 can be considered (in the first instance) as an "accommodation" to handicap.
 
 
 37
 1.In assessing the landlord's burdens under Section 8, the district court relied (as plaintiffs point out) on the onerous requirements imposed on landlords by the "take one, take all" and "endless lease[5]" provisions of the Section 8 program. The court therefore concluded that the accommodations sought by plaintiffs were not required by the FHAA because "[a]lthough the reasonable accommodations provision can and often will require a landlord to incur some expense, it does not require adjustments or modifications to existing programs that would be substantial, or would fundamentally alter the nature of the program, or pose an undue hardship or substantial burden." Id. (citing Shapiro, 51 F.3d at 334). Plaintiffs argue that this rationale has been undermined by the subsequent repeal of those provisions. We disagree.
 
 
 38
 We think that the voluntariness provision of Section 8 reflects a congressional intent that the burdens of Section 8 participation are substantial enough that participation should not be forced on landlords, either as an accommodation to handicap or otherwise. The "take one, take all" and "endless lease" provisions were part of the statute when the voluntariness provision was adopted, and they reflect the kind of burdens that the federal government may impose on participating landlords. These burdens are one side of a coin, and the voluntariness provision is the other.[6] The repeal of the "take one, take all" and "endless lease" provisions does not affect the voluntariness of the Section 8 program, which remains as voluntary today as it was when originally enacted.
 
 
 39
 The repeal of these provisions does not reduce the potential for burdensome requirements. A landlord may consider that participation in a federal program will or may entail financial audits, maintenance requirements, inspection of the premises, reporting requirements, increased risk of litigation, and so on. And of course, the now-repealed requirements could simply be revived. Indeed, the repeals have been effected on a yearly basis, so Congress could simply reinstate the requirements by not renewing the repealer provisions. The trajectory of regulation in this federal program has been down, but that is not predictive or ordained. Moreover, the Section 8 program could end, leaving the landlord with the dilemma of evicting the participating tenants or keeping tenants who lack the wherewithal to pay the full rent--both major commercial risks.
 
 
 40
 The landlord here explained the refusal to accept Section 8 tenants in terms of a general reluctance to become involved with the federal government and its rules and regulations. We think that the onetime existence of the "take one, take all" and "endless lease" provisions amply supports that view, regardless of repeal. More fundamentally, however, the landlord is not required to articulate any justification for a policy of refusing Section 8 certificates. Under the Act, that refusal is a landlord's prerogative.
 
 
 41
 In short, it is easy to conclude that, for landlords who reject voluntary Section 8 participation, the contract with the federal government, the retention of counsel to make the Section 8 arrangements, the requirements for compliance, and the limitations on use (actual and potential), are "unreasonable costs," an "undue hardship," and a "substantial burden," which are not required by the FHAA's reasonable accommodation provision. See Shapiro, 51 F.3d at 335. These terms may be vague, but we think it clear in this case that the burden of participating in the Section 8 program cannot be viewed as imposing only reasonable costs or insubstantial burdens, if only because Congress decided this issue by making participation voluntary.[7]
 
 
 42
 2.We now turn to the more fundamental question of whether a landlord's participation in the Section 8 program should be deemed an "accommodation" (regardless of its reasonableness) within the meaning of the statute. Plaintiffs' claim is a novel one because they do not contend that they require an accommodation that meets and fits their particular handicaps. Rather, they claim an entitlement to an accommodation that remedies their economic status, on the ground that this economic status results from their being handicapped. We think it is fundamental that the law addresses the accommodation of handicaps, not the alleviation of economic disadvantages that may be correlated with having handicaps.
 
 
 43
 Ordinarily, the duty to make reasonable accommodations is framed by the nature of the particular handicap. See, e.g., Jankowski Lee & Assocs. v. Cisneros, 91 F.3d 891, 894-95 (7th Cir.1996) (parking space needed to accommodate sufferer of multiple sclerosis); Bronk v. Ineichen, 54 F.3d 425, 429 (7th Cir.1995) (hearing dog needed by profoundly deaf individuals); Shapiro, 51 F.3d at 330 (parking space for MS sufferer); United States v. Board of Trustees for Univ. of Alabama, 908 F.2d 740, 746 (11th Cir.1990) (sign language interpreter for deaf students). The HUD regulations give two examples of when a reasonable accommodation would be required: the lifting of a no-pets rule to allow use of a seeing-eye dog; or the waiver of a first-come, first-serve policy on parking spots to accommodate the impaired mobility of a person suffering from multiple sclerosis. See 24 C.F.R. § 100.204(b). In all of these cases and examples, it is the handicap that is accommodated. Many reported cases under § 3604(f)(3) involve developers' requests for variances of zoning ordinances that would allow the building of housing for handicapped persons. See United States v. California Mobile Home Park Management Co., 107 F.3d 1374, 1381 n. 3 (9th Cir.1997) (listing cases); Elderhaven, Inc. v. City of Lubbock, 98 F.3d 175, 177 (5th Cir.1996) (elderly care facility requiring special exception from single-family zoning ordinance). In these cases as well, the duty to accommodate is shaped by the handicap, such as the need of people with certain handicaps to live together in order to share support personnel and to reinforce each other's efforts in creating and maintaining a home.
 
 
 44
 Plaintiffs seek to use this statute to remedy economic discrimination of a kind that is practiced without regard to handicap. The "opportunity to use and enjoy" language of the FHAA reinforces the ability of people with handicaps to have the same opportunity as similarly situated persons who have no evident handicaps. What stands between these plaintiffs and the apartments at Stratford Greens is a shortage of money, and nothing else. In this respect, impecunious people with disabilities stand on the same footing as everyone else. Thus, the accommodation sought by plaintiffs is not "necessary" to afford handicapped persons "equal opportunity" to use and enjoy a dwelling. See 42 U.S.C. § 3604(f)(3); see also United States v. California Mobile Home Park Management Co., 29 F.3d 1413, 1417 (9th Cir.1994).
 
 
 45
 Congress could not have intended the FHAA to require reasonable accommodations for those with handicaps every time a neutral policy imposes an adverse impact on individuals who are poor. The FHAA does not elevate the rights of the handicapped poor over the rights of the non-handicapped poor. Economic discrimination--such as the refusal to accept Section 8 tenants--is not cognizable as a failure to make reasonable accommodations, in violation of § 3604(f)(3)(B). Accordingly, we affirm the district court's rejection of plaintiffs' claims under the "reasonable accommodations" provision of the FHAA.
 
 
 46
 C. Claims of Disparate Impact under the Fair Housing Act.
 
 
 47
 A violation of the FHA may be premised on a theory of disparate impact. See LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 425 (2d Cir.1995); Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926, 934-35 (2d Cir.), aff'd in part, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988). Under disparate impact analysis, "a prima facie case is established by showing that the challenged practice of the defendant actually or predictably results in ... discrimination." Huntington, 844 F.2d at 934 (citation and internal quotations omitted). Discriminatory intent need not be shown. Id. at 935. Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to "prove that its actions furthered, in theory and in practice, a legitimate, bona fide ... interest and that no alternative would serve that interest with less discriminatory effect." Id. at 936 (citing Resident Advisory Bd. v. Rizzo, 564 F.2d 126, 148-49 (3d Cir.1977)).
 
 
 48
 We agree with the Seventh Circuit's observation that because the Section 8 program is voluntary and non-participating owners routinely reject Section 8 tenants, the owners' "non-participation constitutes a legitimate reason for their refusal to accept section 8 tenants and ... we therefore cannot hold them liable for ... discrimination under the disparate impact theory." Knapp, 54 F.3d at 1280.
 
 
 49
 Plaintiffs' disparate impact claims were properly dismissed by the district court.
 
 CONCLUSION
 
 50
 The judgment of the district court granting summary judgment in favor of defendants is affirmed.
 
 CALABRESI, Circuit Judge, dissenting:
 
 51
 The majority, in its single-minded determination to reach the result it desires, persistently describes the defendants as individuals who seek nothing more than to avoid the tremendous burden that allegedly accompanies renting to Section 8 recipients. In my view, the defendants, instead, were simply landlords who wished to pick and choose those Section 8 tenants to whom they would rent and those whom they would exclude. At the relevant time, this was a patent violation of the United States Housing Act, 42 U.S.C. § 1437f(t)(1)(A), and no amount of talk can alter this fact. Since there is nothing in the language of that statute or in its legislative history that countenances the extraordinary reading that the majority imposes on this law, and since the majority's other holdings depend on this and analogous errors, I must, with all due respect, dissent.
 
 
 52
 Because of the complexity of the issues involved, I will first outline my disagreements with the majority and then discuss each in detail.
 
 
 53
 (1)The "take one, take all" provision of the United States Housing Act, 42 U.S.C. § 1437f(t)(1)(A), by its express terms prohibited defendants--who accepted Section 8 certificates from preexisting tenants--from refusing to rent to plaintiffs based on their Section 8 status. The majority upholds a judicially created exception that, it concedes, departs from the statute's plain meaning and that, I believe, finds no support in the legislative history. This is clearly wrong.
 
 
 54
 (2)In dicta, the majority goes on to suggest that no implied cause of action existed to allow recipients of Section 8 to enforce § 1437f(t). I disagree with the majority's conclusion on this matter as well, and concur with the district court's finding that such an action exists. Accordingly, while the "take one, take all" provision has been recently repealed (and hence the plaintiffs no longer have a claim for injunctive relief), the case should nonetheless be remanded to the district court for a consideration of damages.
 
 
 55
 (3)Unlike the majority, I believe that the plaintiffs, on the alleged facts, may also have a viable claim under the reasonable accommodation provision of the Fair Housing Act, 42 U.S.C. § 3604(f)(3)(B). To be sure, to prevail on such a claim, the disabled plaintiffs would have to show: (a) that an accommodation to the defendants' occasional "no-Section 8" policy was necessary to allow the plaintiffs an equal opportunity to obtain housing at Stratford Greens, and (b) that the refusal to make such an accommodation would be unreasonable. In the instant case, that means the plaintiffs would have to prove that their Section 8 status came about as a direct result of their respective disabilities,[1] and that an accommodation in defendants' policy would be necessary--given the particular needs created by the plaintiffs' disabilities--in order for the plaintiffs to have an equal opportunity to use and enjoy the dwelling. To prevail in the face of such a showing, the defendants must demonstrate that the increase of one additional Section 8 contract tenant (to those they have already admitted to Stratford Greens) would be so unduly burdensome as to render the accommodation unreasonable. In practice, such showings by the parties will require that the plaintiffs' needs be balanced against the burden that meeting those needs would impose on the defendants. Since on each of these points there are factual issues that have yet to be addressed, I would hold that the grant of summary judgment to the defendants was premature.
 
 
 56
 (4)The plaintiffs' disparate impact claim was likewise prematurely dismissed. While the majority correctly lays out the burden-shifting framework applicable in disparate impact claims under the Fair Housing Act, 42 U.S.C. § 3604(f)(1), (2), it then adopts a novel per se defense to such claims. It holds that landlords who do not participate in Section 8 are immune from liability for discrimination, no matter how great the disparate impact of their actions may be. I believe that I would reject this per se defense, which rests on a jurisprudence developed in the Seventh Circuit that is inconsistent with our own circuit's case law. But I do not need to decide that issue because, once again, the defendants in the case before us are already Section 8 participants. Accordingly, I would reverse the grant of summary judgment on this count as well, and remand the claim--in the light of the plaintiffs' prima facie showing of disparate impact--for consideration (a) of defendants' justifications and (b) of any less discriminatory alternatives to the defendants' current policy that might be available and that could meet whatever legitimate concerns the defendants had.I. The Plain Meaning of 42 U.S.C. § 1437f(t)(1)(A) Should Control
 
 A.
 
 57
 The plain meaning of the (now repealed) "take one, take all" provision of the United States Housing Act, 42 U.S.C. § 1437f(t)(1)(A), prohibited defendant Stratford Greens from refusing to rent apartments to plaintiffs Salute and Kravette on account of their Section 8 status, given that Stratford Greens had accepted Section 8 subsidies from four existing tenants.[2] This unproblematic reading of the Act has, not surprisingly, been applied (before the instant case) without comment at the district court level. See Bronson v. Crestwood Lake Section 1 Holding Corp., 724 F.Supp. 148, 156-57 & n. 9 (S.D.N.Y.1989) (where a landlord accepted Section 8 certificates from existing tenants, but refused to accept new tenants with Section 8 vouchers, the landlord's assertions--that additional burdens were created by being forced to accept vouchers from new tenants--were found to be untenable); see also Glover v. Crestwood Lake Section 1 Holding Corp., 746 F.Supp. 301, 308 (S.D.N.Y.1990) (finding that § 1437f(t) "clearly dictates that owners who accept housing assistance subsidies under the Section 8 certificate or voucher program for some units cannot refuse to rent units to Section 8 voucher holders because of their participation in that program").
 
 
 58
 The district court, in the case before us, however, read an exception into the provision. It exempted those landlords who accepted Section 8 subsidies only from existing tenants from the requirements of the "take one, take all" clause. And it allowed such landlords to refuse to rent to prospective tenants who held Section 8 certificates.[3]
 
 
 59
 The majority correctly notes that the plain meaning of a statute should control except "in those rare cases where 'literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.' " Maj. Op. at 297 (quoting Tomka v. Seiler Corp., 66 F.3d 1295, 1313 (2d Cir.1995)).[4] But though courts do "have some scope for adopting a restricted rather than a literal or usual meaning [of a statute] where acceptance of that meaning would lead to absurd results,"Helvering v. Hammel, 311 U.S. 504, 510, 61 S.Ct. 368, 371, 85 L.Ed. 303 (1941), "courts are not free to reject that meaning where no such consequences follow and where ... it appears to be consonant with the purposes of the Act as declared by Congress and plainly disclosed by its structure," id. at 511, 61 S.Ct. at 371.
 
 B.
 
 60
 In the case before us, application of the plain meaning of § 1437f(t) is not in the least absurd. On the contrary, and in the language of Helvering, it "appears to be consonant with the purposes of the Act as declared by Congress and plainly disclosed by its structure." Id. The distinction created by § 1437f(t) between those landlords who do not participate at all in Section 8 and those who do is totally logical. It may well have been designed, as the majority asserts, to allow landlords who did not wish to be compelled into a "marriage with the government," Maj. Op. at 298 (quoting Salute v. Stratford Greens, 918 F.Supp. 660, 665 (E.D.N.Y.1996)), to avoid any such entanglements. But it required those who opted to participate in the government program to do so fully and not pick and choose the extent of their marriage. We cannot, of course, say that landlords would be driven by a strict application of "take one, take all" to take all such tenants. I, for one, am very much inclined to doubt it. But a judgment to that effect by Congress cannot be deemed absurd.[5]
 
 
 61
 The district court and the majority opinion defend the exception they write into the statute by characterizing the defendants' selective acceptance of Section 8 certificates as acts of compassion that aid low income families in obtaining decent housing. And they add that decent housing for the poor is the primary purpose of Section 8.[6] See id. at 297-98.
 
 
 62
 I do not doubt that this is indeed the purpose of the statute. But if compassion and housing some low income tenants dictate this exception (for landlords willing to accept Section 8 certificates from existing tenants), why not a similar exception for those landlords willing to accept elderly Section 8 recipients? And if these, then why not another exception for widowed Section 8 tenants? Each of these, and many other exceptions, can claim precisely the same "justifications"--compassion and housing specific categories of poor tenants--that the majority accepts today. In fact, the majority's line of "reasoning" has no end except the repeal of Section 8's "take one, take all" requirement. But such a repeal, salutary as it well may be, can only be properly achieved--as it ultimately was--by Congress, and not by judicial fiat.[7] In the end, the point is a simple one. Section 1437f(t)(1)(A) allowed no exceptions, and there is no more reason in language, logic, or legislative history[8] for writing in this exception than any other.C.
 
 
 63
 Lacking any evidence of congressional intent contrary to the plain meaning of the statute, the majority improperly relies on the statute's subsequent repeal as evidence that Congress never really meant what it had clearly said:[9]
 
 
 64
 Now that Congress has actually repealed "take one, take all," one could say that it was repealed to avoid a misinterpretation that could result in evictions of persons that Congress is solicitous to protect, a view that would support our holding. We recognize that one could also say that it was repealed because that effect would flow from the proper reading of the statute....
 
 
 65
 Maj. Op. at 298.
 
 
 66
 In West Virginia University Hospitals, Inc. v. Casey, 499 U.S. 83, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991), the Supreme Court held that the contents of subsequent legislation cannot be used as an indication of the intent of an earlier Congress. See id. at 101, 111 S.Ct. at 1148 ("[I]t is not our function to eliminate clearly expressed inconsistency of policy and to treat alike subjects that different Congresses have chosen to treat differently."). Although the current Congress ultimately, and I believe wisely, repealed the entire "take one, take all" provision of the housing statute, its action cannot erase the clearly expressed intent of the 1988 Congress to protect indigent prospective tenants from discrimination based on their Section 8 status.[10] Politics and policies change. What seems right to one Congress may be anathema to another. All that is as it should be. What is not as it should be is for courts to read non-retroactive laws to have retroactive effect simply because of the court's dislike of the earlier law.[11] Since the repeal of 42 U.S.C. § 1437f(t) is prospective only, it is the original statute, and the intent of the Congress that enacted it, that controls the instant case.[12]
 
 II.The Plaintiffs' Damages Claim
 
 67
 Having accepted the district court's rewriting of the statute, the majority--perhaps reacting skeptically to its own extraordinary interpretative legerdemain--adds that "[i]n any event, it is very far from clear that plaintiffs would have had a viable claim under § 1437f(t) even if such an exception were improper." Maj. Op. at 298.[13] I, instead, am inclined to agree with the district court's conclusion that a right of action does exist under § 1437f(t). For, as the district court found:
 
 
 68
 The House Report accompanying the enactment of the "take one, take all" provision evidences a clear congressional intent to create "an enforceable right for applicants," and explicitly reiterates a "long-standing intention in favor of private enforcement."
 
 
 69
 Salute, 918 F.Supp. at 666 n. 5 (quoting H. Rep. No. 122(I) (1987), reprinted in 1987 U.S.C.C.A.N. 3317, 3348, 3369).[14]
 
 
 70
 The majority is correct that "[b]efore we could consider such a claim, we would be required to resolve close questions concerning the effect of § 1437f(t)'s repeal, and as to whether a private cause of action for damages is (or was) maintainable under the statute." Maj. Op. at 298. But I believe the dicta that follows this statement--casting doubt on the validity of plaintiffs' damages claims on the basis of sheer speculation as to the underlying facts--see id. at 298-300, is utterly inappropriate at the summary judgment stage. Given that the question of damages was not considered below, I would remand the issue to the district court.
 
 
 71
 III. The Waiver of the "No-Section 8" Policy May Be a Reasonable Accommodation under § 3604(f)(3)(B) that Is Necessary To Afford Disabled Individuals Equal Opportunity To Use a Dwelling
 
 
 72
 Apart from their claim that the defendants contravened the "take one, take all" provision of the United States Housing Act, 42 U.S.C. § 1437f(t)(1)(A), the plaintiffs also allege that the defendants discriminated against them on the basis of their disabilities, in violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604(f)(3)(B).[15] While this is a much harder claim to make out, I believe that it too cannot be rejected at the summary judgment stage.
 
 
 73
 As the majority notes, "[u]nder the FHAA, discrimination includes 'a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling.' " Maj. Op. at 300 (quoting 42 U.S.C. § 3604(f)(3)(B)) (emphasis added by majority); see also Shapiro v. Cadman Towers, Inc., 51 F.3d 328, 333 (2d Cir.1995) (construing the section to require landlords and municipalities to waive facially neutral rules or practices where such practices operate to deny handicapped persons equal opportunity to use and enjoy dwellings); H.R.Rep. No. 100-711, at 25 (1988), reprinted in 1988 U.S.C.C.A.N. 2173, 2186, available in 1988 WL 169871 ("This section would require that changes be made to such traditional rules or practices if necessary to permit a person with handicaps an equal opportunity to use and enjoy a dwelling.").
 
 
 74
 In analyzing the statutory mandate, the majority poses two distinct questions: "(A) Is a landlord's participation in the Section 8 program an accommodation to the plaintiffs' handicaps within the meaning of the statute? (B) If so, is such an accommodation a reasonable one that the landlord is therefore required to make?" Maj. Op. at 300.[16]
 
 
 75
 A. Is the accommodation "necessary to afford ... equal opportunity"?
 
 
 76
 To be an accommodation that would, if reasonable, be required by the statute, Stratford Greens' waiver of its partial "no-Section 8" policy with respect to the disabled plaintiffs must be necessary to afford such plaintiffs equal opportunity to use the dwelling. In this respect, the majority is correct that "the duty to make reasonable accommodations is framed by the nature of the particular handicap." Id. at 301. And, as the majority also notes, reasonable accommodations suits involving disabilities have typically fit into one of two fact patterns: (a) cases seeking a change in the general policies of an apartment complex with respect to the use of facilities, dress codes, or rules dealing with support animals; and (b) actions attacking zoning rules and procedures as applied to group homes for persons with mental or physical handicaps.
 
 
 77
 With respect to the first category of cases, after giving several examples, including the lifting of a no-pets rule (to accommodate a seeing-eye dog) and the waiver of a first-come, first-served policy on parking spots (to respond to the impaired mobility of a person with multiple sclerosis), the majority concludes that "[i]n all of these cases and examples, it is the handicap that is accommodated." Id. at 301 (emphasis added). By contrast, the majority charges that in this case "[p]laintiffs' claim is a novel one because they do not contend that they require an accommodation that meets and fits their particular handicaps." Id. at 301.
 
 
 78
 But, in fact, in the seeing-eye dog and parking examples cited by the majority, it is not the handicap itself that is directly accommodated by the change in a policy. Rather, it is the need that was created by the particular handicap that is accommodated. Thus, a person's blindness creates the need for a seeing-eye dog, and a person's multiple sclerosis leads to impaired mobility, which, in turn, creates the need for a priority parking space close to the tenant's residence.
 
 
 79
 This is even more obviously so, as the majority implicitly recognizes, with respect to the "[m]any reported cases under § 3604(f)(3) involv[ing] developers' requests for variances of zoning ordinances that would allow the building of housing for handicapped persons." Id. at 301. The majority states: "In these cases as well, the duty to accommodate is shaped by the handicap, such as the need of people with certain handicaps to live together in order to share support personnel and to reinforce each other's efforts in creating and maintaining a home." Id. (emphasis added). But what is clearly happening in the zoning cases, just as in the others, is that accommodations are being imposed in response to needs created by particular disabilities rather than to the disabilities themselves. And policies that, in a sense, are unrelated to a given disability must nonetheless be changed because of the disability, since they can ameliorate its effects.
 
 
 80
 For example, in Oxford House, Inc. v. Town of Babylon, 819 F.Supp. 1179 (E.D.N.Y.1993), the district court considered an FHAA challenge to a provision in the zoning code of Babylon, New York, that restricted a particular property to a "family" or the "functional and factual equivalent of a natural family," and hence prohibited the establishment of a group home for recovering alcoholics. See id. at 1183. The defendant argued that any discriminatory effect its ordinance might have had on the plaintiffs was "due to plaintiffs' transiency and failure to live as a family, not because of their handicap." Id. The court rejected this argument and concluded that the plaintiffs had shown both that the zoning provision had a disparate impact on persons with disabilities and--more germane to the current discussion--that the town had failed to make a reasonable accommodation to the plaintiffs' disabilities. See id. at 1185-86. In other words, though the policies were not related to the plaintiffs' handicap, an accommodation was nonetheless mandated because it responded to the needs directly engendered by that handicap.[17]
 
 
 81
 It should be clear, therefore, that the plaintiffs' allegations in the case before us are anything but novel. Plaintiffs' respective disabilities, because they prevent them from working, have created a particular need for Section 8 certificates. Accordingly, plaintiffs have asked defendants to accommodate their needs by waiving the facially neutral "no-Section 8" policy. It follows that the majority is wrong when it suggests that, as a matter of law, a landlord's waiver of a "no-Section 8" policy can never be deemed an accommodation within the meaning of the statute.
 
 
 82
 It may be, however, that the majority does not actually disagree with me that the distinction between accommodating a disability and accommodating the needs engendered by that disability is simply not viable. And the majority may, therefore, not be rejecting the notion that reasonable accommodations are required when they respond to needs directly created by a would-be-tenant's disability. My learned colleagues may instead simply be questioning whether the plaintiffs in the case at hand were denied "equal opportunity" in housing due to any need directly created by their disabilities. Significantly, the majority concludes that "[w]hat stands between these plaintiffs and the apartments at Stratford Greens is a shortage of money, and nothing else. In this respect, impecunious people with disabilities stand on the same footing as everyone else." Maj. Op. at 302.
 
 
 83
 Unlike the previous argument, this position, at least, is plausible. If, as the majority asserts, the plaintiffs are disabled individuals who happen to be poor (and thus Section 8 recipients), then the group to which they are compared becomes non-disabled individuals who are poor. Since these latter would-be-tenants are also excluded, no discrimination against the disabled exists.
 
 
 84
 But the majority's conclusion depends on the assumption that plaintiffs are poor people who are also, and by chance, handicapped, rather than individuals who are poor because they are handicapped.[18] As such--while the majority may or may not prove ultimately to be correct--its position is completely inappropriate at this early stage of the proceedings. For purposes of ruling on the summary judgment motion, we must accept as true the undisputed fact that the plaintiffs are Section 8 recipients as a direct result of their handicaps.
 
 
 85
 The express claim the plaintiffs make goes far beyond that of a correlation between disability and Section 8 status. They allege a direct causal link. They say that their disabilities prevent them from working, which necessarily makes them poor and thereby puts them into Section 8 status.[19] Plaintiffs' corollary assertion is clearly that if they were not disabled and, hence, could work, they would earn enough money to be able to rent at Stratford Greens without Section 8 help. At this stage we are therefore bound to conclude that plaintiffs are excluded from Stratford Greens solely on account of their respective disabilities, since it is these disabilities that created their need for Section 8 certificates.
 
 
 86
 So viewed, the plaintiffs' situation is completely analogous to that of a blind person with a dog who is denied access to a housing complex that has a "no pets policy." We might treat disabled people with dogs as similarly situated to non-disabled dog owners, and say there is no discrimination since both are excluded. And, if the blind would-be-tenant's dog were a chihuahua, then this comparison might be appropriate. But if the blind individual had a seeing-eye dog--in other words, if her disability created the need for the dog--then, the comparison no longer applies. And the housing complex would be obliged to accommodate the dog (if it reasonably could do so), so long as the would-be-tenant needed the dog as a direct result of her disability.
 
 
 87
 Similarly, in this case, we could look at the situation of a disabled person with a Section 8 certificate in one of two ways: The plaintiffs could be poor people who happen to be disabled (dog lovers who happen to be blind), or they could be people who are poor because they are disabled (blind people who need a seeing-eye dog because they are blind). It is only in the latter case--where the would-be-tenant needs the Section 8 subsidy as a direct result of a disability--that the housing complex must reasonably accommodate that person.[20]
 
 
 88
 In the instant case, whether the plaintiffs would be able to work but for their respective disabilities, and whether they would then cease to qualify for Section 8 certificates is--given their unrebutted allegations--at the very least a question of fact. They may not, ultimately, be able to prove what they allege. But the law affords them that opportunity. Accordingly, the motion for summary judgment should have been denied (unless, of course, no reasonable accommodation to their disabilities can be made).
 
 
 89
 B. Is the accommodation "reasonable"?
 
 
 90
 As the majority properly notes, the reasonable accommodations provision " 'does not require adjustments or modifications to existing programs that would be substantial, or would fundamentally alter the nature of the program, or pose an undue hardship or substantial burden.' " Maj. Op. at 300 (quoting Salute, 918 F.Supp. at 667). In considering whether a proposed accommodation is mandated by the FHAA, a court must balance the plaintiff's interest in equal housing against the defendant's interest in the integrity of the scheme that would be altered as a result of the accommodation. Cf. Alexander v. Choate, 469 U.S. 287, 300, 105 S.Ct. 712, 719-20, 83 L.Ed.2d 661 (1985).
 
 
 91
 Our court has held that "the determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification ... and the cost to the organization that would implement it." Staron v. McDonald's Corp., 51 F.3d 353, 356 (2d Cir.1995).
 
 
 92
 In the case at hand, as the majority acknowledges, the landlord justified its "no-Section 8" policy "in terms of a general reluctance to become involved with the federal government and its rules and regulations." Maj. Op. at 301. The majority then explains what the burdens that dealing with the government might be--including "the contract with the federal government, the retention of counsel to make the Section 8 arrangements, the requirements for compliance, and the limitations on use (actual and potential)"--and concludes that these amount to " 'unreasonable costs,' an 'undue hardship,' and a 'substantial burden,' which are not required by the FHAA's reasonable accommodation provision." Id. (citing Shapiro, 51 F.3d at 335) (emphasis added by majority).
 
 
 93
 The majority concedes that "[t]hese terms may be vague," but it emphasizes that "the burden of participating in the Section 8 program cannot be viewed as imposing only reasonable costs or insubstantial burdens, if only because Congress decided this issue by making participation voluntary." Id. In so doing, the majority suggests, Congress recognized Section 8 participation to be an unreasonable burden and freed landlords from having "to articulate any justification for a policy of refusing Section 8 certificates." Id.[21]
 
 
 94
 One may well question whether Congress, in making Section 8 participation voluntary was also making a failure to participate in Section 8 an absolute defense to any discrimination claims that might be brought under the Fair Housing Amendments Act by Section 8 participants. But, more important, the majority's argument is simply irrelevant to the case at hand.
 
 
 95
 It is established in this case that the defendants had, in fact, accepted Section 8 certificates from four preexisting tenants. And the moment a landlord accepts one Section 8 tenant, the landlord shoulders a considerable part of the allegedly unreasonable burdens of a contractual and financial relationship with the Public Housing Authority. The question necessarily becomes: does the addition of a subsequent Section 8 contract to accommodate a handicapped person's disability increase the burden on the landlord so much as to be unreasonable as a matter of law?[22]
 
 
 96
 In this case, the landlord has at most alleged only a vague reluctance to become involved with the federal government. He has, moreover, already "entangled" himself with the government by accepting Section 8 certificates from four other tenants. Under the circumstances, it cannot reasonably be said that he has met his burden of establishing "undue hardship" or a fundamental alteration in the nature of his rental scheme as a matter of law. Accordingly, summary judgment in his favor cannot stand.
 
 
 97
 IV. Landlords Could Be Liable Under § 3604(f)(1), (2) of the FHA for the Disparate Impact on Disabled Individuals of Their "No-Section 8" Policy
 
 
 98
 I agree with the majority that "[a] violation of the FHA may be premised on a theory of disparate impact." Maj. Op. at 302 (citing LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 425 (2d Cir.1995); Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926, 934-35 (2d Cir.), aff'd on other grounds, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988) (per curiam)). I also agree that the burden-shifting analysis established in Huntington and laid out by the majority is the appropriate test for disparate impact claims.
 
 
 99
 But beyond this, we part ways. For the majority chooses not to evaluate plaintiffs' disparate impact allegation under the burden-shifting scheme that is established in our circuit. Instead--because plaintiffs are Section 8 recipients--it adopts a novel per se defense theory put forth by the Seventh Circuit in Knapp v. Eagle Property Management Corp., 54 F.3d 1272 (7th Cir.1995):
 
 
 100
 [T]he owners' "non-participation constitutes a legitimate reason for their refusal to accept section 8 tenants and ... we therefore cannot hold them liable for ... discrimination under the disparate impact theory."
 
 
 101
 Maj. Op. at 302 (quoting Knapp, 54 F.3d at 1280) (omissions in original). And, on this basis, the majority affirms the district court's holding that the defendants were immune from liability for disparate impact.
 
 
 102
 I very much doubt whether the Seventh Circuit's approach is consistent with our precedents.[23] But I do not need to reach that issue, as Knapp is manifestly inapplicable to this case. The point, once again, is that the defendants here were not non-participants in Section 8 programs. They were partial participants. Even if the per se defense were appropriate for landlords who eschew any involvement with Section 8, it clearly has no place in dealing with those who have chosen to accept some Section 8 tenants. At least as to these landlords, there is no reason why our well-established Huntington burden-shifting analysis should be discarded.
 
 
 103
 The plaintiffs have successfully demonstrated that the defendants' policy of refusing to lease apartments to Section 8 certificate holders has a disproportionately adverse effect on the disabled.[24] Under Huntington, the burden, therefore, shifted to the defendants to prove that "[their] actions furthered, in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve the interest with less discriminatory effect." Huntington, 844 F.2d at 936, aff'd on other grounds, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (per curiam). The defendants have not met this burden; specifically, they have not sufficiently demonstrated that, as a matter of law, no less discriminatory alternative was available.[25] It follows that summary judgment was inappropriate and that plaintiffs' disparate impact claim was, at the least, dismissed prematurely.
 
 V. Conclusion
 
 104
 The judgment of the district court granting summary judgment in favor of defendants should be reversed. (1) The judicially created exception to 42 U.S.C. § 1437f(t)(1)(A) has no basis in language, logic, or legislative history and should be rejected. Plaintiffs' private right of action under Section 1437f(t)(1)(A) should be affirmed. And plaintiffs' claim should be remanded to the district court for a consideration of the availability of damages. (2) Plaintiffs' reasonable accommodation claim under 42 U.S.C. § 3604(f)(3)(B) should be sent back to determine whether plaintiffs' Section 8 status was as a direct result of their respective disabilities, and, if so, whether the "cost" of an additional Section 8 contract (in light of the Section 8 contracts already accepted by defendants) constitutes an unreasonable burden. (3) Finally, on the facts here alleged, the per se defense to plaintiffs' disparate impact claim should be rejected. And the disparate impact claim should likewise be remanded to the district court for full examination under the Huntington burden-shifting framework.
 
 
 105
 Since, on each of these issues, my conclusions differ from those of the majority, I respectfully dissent.
 
 
 
 [1]
 Plaintiffs' argument that the district court did not examine the legislative history of the provision is simply inaccurate. See Salute, 918 F.Supp. at 664 & n. 2
 
 
 [2]
 When an intervening repeal of a statute affects the propriety of prospective relief, a court should apply the law in effect at the time it renders its decision. Landgraf v. USI Film Prods., 511 U.S. 244, 273-74, 114 S.Ct. 1483, 1501-02, 128 L.Ed.2d 229 (1994) (application of intervening statute authorizing or affecting prospective relief is not impermissible retroactivity); American Steel Foundries v. Tri-City Central Trades Council, 257 U.S. 184, 201, 42 S.Ct. 72, 75, 66 L.Ed. 189 (1921) (statute enacted during appeal governs propriety of injunctive relief because "relief by injunction operates in futuro")
 
 
 [3]
 The Cort factors are: (1) whether the plaintiff is a member of the class for whose benefit the statute was enacted; (2) whether there is any indication of legislative intent, explicit or implicit, to create or deny such a remedy; (3) whether implying such a remedy is consistent with the underlying purposes of the legislative scheme; and (4) whether the cause of action is one traditionally relegated to state law in an area of concern to the States, making it inappropriate to infer a cause of action based on only federal law. 422 U.S. at 78, 95 S.Ct. at 2087-88
 
 
 [4]
 Complicating matters still further, the majority in Franklin, as well as Justice Scalia in his separate concurrence, pointed out that when courts infer a private right of action from a statute that is silent on its face, the usual recourse to statutory text and legislative history to determine congressional intent will be of limited value. 503 U.S. at 71, 76, 112 S.Ct. at 1035-36, 1038. The Court in Franklin therefore consulted the general state of the law when Congress passed the statute at issue there (Title IX), as well as congressional actions taken in the years after the Court had (in a prior case) announced that a private cause of action could be maintained under the statute. Id. at 72-73, 112 S.Ct. at 1036-37. In this case, the general state of the law when § 1437f(t) was adopted discloses no legislative intent to abandon the presumption in favor of all available remedies. On the other hand, only a few district and appellate courts--not the Supreme Court--have found an implied right of action in § 1437f(t), and there has been no significant congressional action after these cases (except repeal) indicating anything about Congress' intent as to the available remedies under § 1437f(t)
 Moreover, application of the general rule of Franklin to this case could tend to frustrate the purpose of § 1437f(t), which is to increase the availability of low-income housing. "Allowing the recovery of potentially unlimited compensatory damages undoubtedly would deter owners from participating in the section 8 program and would be counterproductive to congressional goals." Knapp v. Eagle Property Management Corp., 54 F.3d 1272, 1278 (7th Cir.1995). At least one appellate court has therefore distinguished Franklin as not answering the question of what damages may be awarded under § 1437f(t), and has concluded that only contractual remedies, not tort remedies, are recoverable under the provision. See id. at 1278-79.
 
 
 [5]
 The so-called "endless lease" provision, 42 U.S.C. § 1437f(d)(1)(B)(ii), provided that at the conclusion of a lease period, landlords could not refuse to renew the leases of Section 8 tenants "except for serious or repeated violation of the terms and conditions of the lease, for violation of applicable Federal, State or local law, or for other good cause." This provision was effectively repealed (through amendment) along with § 1437f(t)(1)(A). See Pub.L. No. 104-134, § 203(c), 110 Stat. 1321 (1996)
 
 
 [6]
 We have no reason to suppose that the statute could have been enacted without the voluntariness provision
 
 
 [7]
 Plaintiffs implicitly recognize this principle. Prior to § 1437f(t)'s repeal, they argued that a landlord who accepts Section 8 vouchers as an accommodation to people with handicaps would not or should not be subjected to "the take one, take all" rule--a kind of reverse exception. Plaintiffs therefore cannot contest that there can be substantial detriments to landlords who participate in the Section 8 program, a concession that is fatal to their claim
 
 
 [1]
 The statute uses the term "handicap"; the plaintiffs prefer "disability." We use the two words interchangeably
 
 
 [2]
 The "take one, take all" provision stated:
 (1)No owner who has entered into a contract for housing assistance payments under this section on behalf of any tenant in a multifamily housing project shall refuse--
 (A)to lease any available dwelling unit in any multifamily housing project of such owner ... to a holder of a certificate of eligibility under this section a proximate cause of which is the status of such prospective tenant as a holder of such certificate, and to enter into a housing assistance payments contract respecting such unit.
 42 U.S.C. § 1437f(t)(1)(A) (emphasis added), temporarily repealed by Pub.L. No. 104-134, Title I, § 101(e) [Title II, § 203(a),(d) ], 110 Stat. 1321, 1321-281 (1996) (effective fiscal year 1996), amended by Pub.L. 104-204, Title II, § 201(e), 110 Stat. 2874, 2893 (1996) (effective fiscal years 1996 and 1997).
 Though the majority describes the congressional action as a repeal, see Maj. Op. at 295, 298-99, what Congress actually did was to suspend the law effective for the fiscal years 1996 and 1997. For purposes of the analysis in this dissent, it does not matter whether the law is viewed as suspended or repealed.
 
 
 [3]
 It did this despite its own earlier ruling in which it had granted a preliminary injunction requiring the defendants to rent an apartment to plaintiff Kravette. In this prior holding, the district court had expressed its skepticism as to the defendants' request for "a judicially-created exception to a statute that, on its face, unambiguously governs this case." Salute v. Stratford Greens, 888 F.Supp. 17, 20 (E.D.N.Y.1995). Furthermore, the court had doubted "that it would be appropriate for a court--rather than the legislature--to afford the defendants the relief they seek." Id
 
 
 [4]
 Even where a literal application of a statute would lead to an arguably absurd result, courts are not permitted "to fashion the rule [they] deem desirable but [they are] to identify the rule that Congress fashioned." Green v. Bock Laundry Mach. Co., 490 U.S. 504, 508, 109 S.Ct. 1981, 1984, 104 L.Ed.2d 557 (1989); see also Public Citizen v. U.S. Dep't of Justice, 491 U.S. 440, 454, 109 S.Ct. 2558, 2567, 105 L.Ed.2d 377 (1989) ("Where the literal meaning of a statutory term would 'compel an odd result,' we must search for other evidence of congressional intent to lend the term its proper scope.") (citation omitted)
 
 
 [5]
 Similarly, Congress might have believed that extended experience with the program would lead landlords to overcome their fears both of the bureaucracy attached to Section 8 and of Section 8 tenants themselves. Again, I am skeptical, but such a view by Congress is clearly within the range of reason
 
 
 [6]
 The district court and the majority opinion implicitly assume that a landlord's acceptance of a Section 8 subsidy from a preexisting tenant is an act of "compassion." But it is by no means clear that the acceptance of guaranteed government rent payments from preexisting tenants represents an act of altruism on the part of the landlord, and is not just a decision to accept those who are Section 8 tenants known by the landlord to be "O.K.," while rejecting those of whom the landlord is suspicious. (In other words, to engage in precisely the type of selective acceptance that Congress--rightly or wrongly--had forbidden.) Nor is it clear, as the majority assumes, see Maj. Op. at 298, that a landlord faced with the "take one, take all" provision as then written would choose to evict a preexisting good tenant rather than to keep the good tenant and, as a consequence, accept other Section 8 tenants in the future
 
 
 [7]
 Lest there be any doubt, I believe that the repeal of Section 1437f(t)(1)(A) was sound policy and will promote better housing for the poor. But my view of the matter, like the majority's similar view, is irrelevant and must yield to that of Congress
 
 
 [8]
 The majority admits that the "clear purpose of § 1437f(t)," as evidenced by House Report No. 100-122(I), was "to prevent landlords from picking and choosing from the pool of Section 8 applicants who apply to rent apartments, and thereby to promote access to decent and affordable housing for lower income households." Maj. Op. at 297. In fact, the actual language of the House Report is considerably stronger and states that Congress enacted this provision to
 create[ ] an enforceable right for applicants that would prohibit owners that receive Section 8 subsidies for any other units in the project from refusing to rent a unit to a certificate ... holder ... because the applicant has a Section 8 certificate....
 H.R.Rep. No. 100-122(I), at 32 (1987) (emphasis added), reprinted in 1987 U.S.C.C.A.N. 3317, 3348, available in 1987 WL 61521. In other words, the Report focused on Congress' intent to prevent the rejection of applicants because of their status as certificate holders, without regard to the circumstances of the landlord's prior acceptance of Section 8. In doing so, it made no distinction whatsoever between existing and new tenants. It is therefore difficult to see how the legislative history supports the district court's conclusion--embraced by the majority--that "[t]he case before [it] d[id] not implicate th[e] concern [of the House Report]." See Salute, 918 F.Supp. at 664-65.
 
 
 [9]
 The district court also improperly relied on prior efforts to repeal the statute. See id. at 665
 
 
 [10]
 And it meant to do so even if it occasionally meant that some Section 8 tenants, viewed as desirable by landlords, might lose out as a result
 
 
 [11]
 The legislative history of the repeal suggests that the provision was removed in order to encourage greater landlord participation in the Section 8 program. See Revising Housing Programs: Hearings on H.R. 2406 before the Subcomm. on Housing and Community Opportunity of the House Banking and Financial Services Activity, 100th Cong. (1995) (statement of Secretary Henry G. Cisneros), available in 1995 WL 11095621. This is surely an appropriate legislative motive. It is also one that in no way supports the particular exceptions the majority has adopted. Thus, after the repeal, if a landlord accepts a Section 8 certificate from one tenant-- whether preexisting or prospective--the landlord does not have to accept other qualified Section 8 tenants. Congress, in repealing the statute, gave no inkling that it might be in the least bit interested in the distinction between old and new tenants that underlies the majority's tortured reading
 
 
 [12]
 The majority states that "in any event, repeal assures that our reading does no violence to any clearly expressed congressional intent." Maj. Op. at 298. But if the majority's reading in fact contravenes the intent of the Congress that originally passed the statute, and if the later Congress made its repeal prospective only, it clearly does great violence
 
 
 [13]
 I have always been suspicious of those who, having refused an invitation to a party on the ground that they have a prior engagement, add that, in any event, they are ill and for that reason, too, cannot attend
 
 
 [14]
 The Seventh Circuit--in an analysis (both of the private right of action and of the damages issues) that parallels the structure laid out in the majority's opinion--like the district court in this case, concluded that an implied right of action existed under § 1437f(t). See Knapp v. Eagle Property Management Corp., 54 F.3d 1272, 1277 (7th Cir.1995) (citing Peyton v. Reynolds Assoc., 955 F.2d 247, 250 (4th Cir.1992); Glover v. Crestwood Lake Section 1 Holding Corp., 746 F.Supp. 301, 308-09 (S.D.N.Y.1990))
 
 
 [15]
 The Fair Housing Amendments Act of 1988 ("FHAA") extended the Act to protect handicapped persons. See Pub.L. No. 100-430, 102 Stat. 1619 (1988) (amending 42 U.S.C. §§ 3601-3619)
 
 
 [16]
 The majority actually addresses the questions in reverse order, explaining:
 Because the district court held that it would be unreasonable to require Stratford Greens to shoulder the burdens of Section 8, and we agree, we start our review there, and consider later the more fundamental question of whether participation in Section 8 can be considered (in the first instance) as an "accommodation" to handicap.
 Maj. Op. at 300. In so doing, the majority once again displays an unrelenting eagerness to decide far more than it needs to resolve the case before it. It would be one thing if the majority assumed arguendo that participation in Section 8 was an accommodation under the statute and then held that such an accommodation was unreasonable as a matter of law. But instead the majority, after affirming the rejection of the plaintiffs' claims under 42 U.S.C. § 3604(f)(3) on the same ground as the district court (the unreasonableness of the accommodation), goes on also to affirm on the alternate ground--that "[e]conomic discrimination--such as the refusal to accept Section 8 tenants--is not cognizable as a failure to make reasonable accommodations." Maj. Op. at 302. Given this second finding, its first holding is wholly superfluous.
 
 
 [17]
 In fact, some cases go beyond this view to embrace a more expansive position and require reasonable accommodations to allow a disabled person to live in a particular dwelling, even where such an accommodation is wholly unrelated to particular needs created by the disability. In United States v. City of Philadelphia, 838 F.Supp. 223, 228-29 (E.D.Pa.1993), aff'd, 30 F.3d 1488 (3d Cir.1994) (table), a charitable organization wanted to convert a commercially zoned building to residential use for operation as a group home for the mentally impaired. The local zoning ordinance stated that a residential building had to have a rear yard, whereas the building had only a large side yard. The City argued that the application of the zoning ordinance did not violate the FHAA because there was no "causal nexus" between the ordinance's provision (the rear-yard requirement) and the prospective residents' handicaps. See id. at 229. The court rejected this argument and held that "the language of § 3604(f) does not suggest that to establish a Fair Housing Act violation, a plaintiff must show a causal nexus between the challenged provision and the handicaps of the prospective residents." Id. The court explained that subsection 3604(f)(3) contains an independent definition of "discrimination," one which, unlike subsections 3604(f)(1) and (2), is not modified by the phrase "because of ... handicap." See id. And the Third Circuit affirmed this holding. See 30 F.3d 1488 (table)
 This construction of the reasonable accommodation provision reflects the more general position prevalent in the Third Circuit that "one of the purposes behind the reasonable accommodation provision is to address individual needs and respond to individual circumstances," Horizon House Developmental Servs., Inc. v. Township of Upper Southampton, 804 F.Supp. 683, 699 (E.D.Pa.1992), aff'd, 995 F.2d 217 (3d Cir.1993) (table). See also Hill v. Community of Damien of Molokai, 121 N.M. 353, 911 P.2d 861, 875 (1996) ("The restriction [involving property to be used as a group home for AIDS sufferers] need only serve as an impediment to an individual plaintiff who is handicapped and is denied access to housing in order to implicate the 'reasonable accommodation' requirement of the FHA."). This approach is closely linked to the view that the disabled are afforded preferential treatment by the FHAA. But one certainly need not adopt the view that preferential treatment of the disabled is required to conclude that the reasonable accommodation provision mandates accommodations in policies in order to respond directly to the effects of disabilities or to the needs created by them.
 
 
 [18]
 In this respect, my dissent here may at first glance seem to be inconsistent with the reasoning of the majority in Buckley v. Consolidated Edison Co., 127 F.3d 270, 274-75 (1997). In fact, neither the Buckley holding nor its dissent gives support to either opinion in this case
 
 
 [19]
 Plaintiffs assert that "[a]s a result of his disabilities, Salute has been unable to work since approximately 1982," Br. for Appellants at 7, and "[Kravette's] medical condition has prevented her from working since 1988," id. at 10. And according to the district court, "Salute suffers from multiple medical problems, including chronic asthma, dextroscoliosis of the back, diverticulitis, ulcerative colitis and depression." Salute, 918 F.Supp. at 662. "Kravette ... suffers from degenerative rheumatoid arthritis, which affects her spine, neck, wrists and knees.... [Her] afflictions prevent her from working...." Salute, 888 F.Supp. at 19
 The majority improperly does not accept these undisputed facts, as it must at summary judgment. Instead, it claims that "it is fundamental that the law addresses the accommodation of handicaps, not the alleviation of economic disadvantages that may be correlated with having handicaps." Maj. Op. at 301.
 
 
 [20]
 In this latter case it does not matter whether the would-be-tenant has an independent affinity for the accommodation. Thus the blind person may like dogs (or may be a cat lover who hates them). Similarly, the disabled individual may be a Fabian socialist and take pleasure in being a Section 8 tenant (or may be a libertarian and hate it). The extra pleasure or pain is, in either case, irrelevant. What matters is whether the need for the accommodation is caused directly by the handicap or is casual to it
 
 
 [21]
 According to the majority, "the onetime existence of the 'take one, take all' and 'endless lease' provisions amply supports that view, regardless of repeal." Maj. Op. at 298
 
 
 [22]
 For this reason, plaintiffs' concession that "there can be substantial detriments to landlords who participate in the Section 8 program" is--the majority's assertion to the contrary notwithstanding--by no means "fatal to their claim." Maj. Op. at 301 n. 7
 
 
 [23]
 As the majority notes, our circuit has established a burden-shifting scheme for disparate impact claims under the Fair Housing Act. See Maj. Op. at 302. And in applying that scheme we have rejected the view that a legitimate interest can, by itself, be so significant as to outweigh any disparate impact, no matter how substantial. See Huntington, 844 F.2d at 937 ("Though a town's interests in zoning requirements are substantial, they cannot ... automatically outweigh significant disparate effects.") (citations omitted), aff'd on other grounds, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (per curiam). It follows that the majority's reliance on Knapp to foreclose further inquiry is dubious at best
 The Seventh Circuit, moreover, has been uniquely inhospitable to housing discrimination claims. It has, for instance, held that courts must use their discretion in determining whether any given case supports a finding of statutory relief. See Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights, 558 F.2d 1283, 1290 (7th Cir.1977) ("[C]ourts must use their discretion in deciding whether, given the particular circumstances of each case, relief should be granted under the statute."). It has also held that racial steering claims under the FHAA require proof of discriminatory intent, see Village of Bellwood v. Dwivedi, 895 F.2d 1521, 1529-33 (7th Cir.1990), and it has doubted whether FHAA claims are "subject to proof under a disparate impact formula," NAACP v. American Family Mutual Ins. Co., 978 F.2d 287, 292 (7th Cir.1992). Finally, the Seventh Circuit is the only circuit that has deviated from the consensus of federal courts that recognize the availability of disparate impact claims under the FHAA. See LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 425 (2d Cir.1995); Mountain Side Mobile Estates Partnership v. Secretary of HUD, 56 F.3d 1243, 1250-57 (10th Cir.1995); Jackson v. Okaloosa County, 21 F.3d 1531, 1543 (11th Cir.1994); Casa Marie, Inc. v. Superior Court of Puerto Rico, 988 F.2d 252, 269 n. 20 (1st Cir.1993); Doe v. City of Butler, 892 F.2d 315, 323 (3d Cir.1989); Edwards v. Johnston County Health Dep't, 885 F.2d 1215, 1223 (4th Cir.1989). The per se defense theory advanced in Knapp builds upon, and is consistent with, the approach of these Seventh Circuit precedents. It is, therefore, especially unsuited for adoption by us.
 
 
 [24]
 As the district court acknowledged, the plaintiffs submitted an affidavit from a sociologist indicating that Stratford Greens' policy of excluding Section 8 certificate holders had a disparate impact on people with disabilities. See Salute, 918 F.Supp. at 667. The affidavit was based on research findings that Suffolk County residents with disabilities were up to three times as likely as those without disabilities to be eligible for Section 8
 While there are no specific guidelines governing the magnitude of a disparate impact necessary to establish a prima facie case, in Huntington a showing that 28% of the area's minority residents and 11% of the white residents were eligible for public housing was deemed to be a sufficient prima facie showing. See Huntington, 844 F.2d. at 938. The Supreme Court affirmed Huntington. See Huntington, 488 U.S. 15, 109 S.Ct. 276 (1988) (per curiam). But because the defendant had conceded the applicability of the Second Circuit's disparate impact test, the High Court declined to "reach the question whether that test is the appropriate one." Id. at 18, 109 S.Ct. at 277. (The Court did note, however, that it was "satisfied on this record that disparate impact was shown, and that the sole justification proffered to rebut the prima facie case was inadequate." Id.)
 
 
 [25]
 The defendants, during discovery, offered several justifications for their refusal to lease apartments to Section 8 certificate holders. The defendants, however, did not press these explanations during the summary judgment proceedings, nor were they addressed by the district court