[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-13960

_____

D.C. Docket No. 5:16-cv-00311-JSM-PRL

ALBERT SCHAW,

Plaintiff - Appellant,

versus

HABITAT FOR HUMANITY OF CITRUS COUNTY, INC.,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(September 18, 2019)

Before TJOFLAT, MARCUS, and NEWSOM, Circuit Judges.

NEWSOM, Circuit Judge:

Albert Schaw, a quadriplegic, applied for a home with Habitat for Humanity

of Citrus County.  Because his annual social-security-disability income didn't meet

Habitat's minimum-income threshold, Schaw requested an accommodation that would allow him to supplement those funds with either food stamps or a notarized letter memorializing the financial support that he received from his family. When Habitat refused, Schaw sued under the Fair Housing Amendments Act, 42 U.S.C. § 3601 *et. seq*., which prohibits an entity from discriminating against a disabled individual by failing to make "reasonable accommodations" in policies and practices that are "necessary to afford" the individual an "equal opportunity to use and enjoy a dwelling." *Id.* § 3604(f)(3)(B). Schaw separately alleged that Habitat's minimum-income requirement has a disparate impact on disabled individuals receiving social-security-disability income.

The district court granted Habitat summary judgment on the basis that Schaw's requested accommodation wasn't "necessary" within the meaning of the Act, reasoning that it would alleviate only his "financial condition—not his disability." The court also concluded that Schaw had failed to state a disparate-impact claim. After careful review, we conclude that while the district court correctly rejected Schaw's disparate-impact claim, it failed to properly analyze his failure-to-accommodate claim. Accordingly, we vacate and remand for further proceedings consistent with this opinion as to Schaw's failure-to-accommodate claim.

**I**

**A**

Shortly after he graduated from high school, Albert Schaw was in a wrestling accident that left him completely paralyzed.  Schaw is now wheelchair-bound, and his current abode is ill-suited to accommodate his quadriplegia—it isn't wheelchair accessible, and there's no way for him to close the bathroom door for privacy.  After seeing a television advertisement for Habitat for Humanity, a nonprofit that builds new homes for low-income individuals, Schaw decided to apply.

When Schaw met to discuss the application process with Habitat's Family Services Director, Rose Strawn, he learned that Habitat imposes a minimum-gross-annual-income requirement of $10,170, presumably to ensure that potential homeowners will be able to pay their mortgages.  According to Schaw, his disability prevents him from working, so his main source of income is a Social Security Disability Insurance stipend of $778 per month, which equates to a gross annual income of $9,336.  Given the fixed nature of his SSDI, Schaw asked Habitat to consider one of two other sources of income toward its requirement.  First, Schaw receives $194 per month in food stamps.  With the food stamps, Schaw's gross annual income would be $11,664—enough to qualify.  Second, Schaw receives $100 per month in familial support from his father.  With that gift,

3

his gross annual income (even excluding the food stamps) would be $10,536—also enough to qualify. On Strawn's recommendation, Schaw provided a notarized letter from his father confirming that he gives Schaw $100 each month.

Habitat's Board of Directors reviewed Schaw's application and determined that it couldn't accept either of the two additional sources of income. It wouldn't consider the food stamps because Habitat follows HUD guidelines, which provide that food stamps don't count as income. And it wouldn't accept the notarized letter from Schaw's father because the letter wasn't a legally enforceable guarantee that the monthly support would continue. The Board therefore rejected Schaw's application. It did, however, indicate that it would reconsider if the familial support took the form of a trust or an annuity.

Shortly thereafter, Schaw's attorney, Rebecca Bell, contacted Strawn to explain that a trust wouldn't work because it could jeopardize Schaw's ability to receive government benefits. When Strawn then suggested an annuity, Bell explained that she didn't handle annuities but knew financial advisors who did, and Strawn took that to mean that Bell would discuss the annuity option with Schaw. Strawn then sent Schaw a "Letter of Intent" explaining the conditions he needed to meet in order to qualify. One of those requirements was that he "[p]rovide documentation for [an] Annuity Plan, (for minimum of five years), as verification of monthly support provided by [his] Father." Later, Schaw (through his aunt,

4

Susan Hale) sent an email to Habitat inquiring as to the status of his application. George Rusaw, Habitat's president and CEO, responded that Schaw needed to provide "legally codified" evidence of the familial support and that "the notarized letter from [Schaw's] father [was] legally insufficient."

## B

Schaw sued Habitat under the Fair Housing Amendments Act, 42 U.S.C. § 3604(f), bringing two separate claims. First, he asserted that Habitat violated § 3604(f)(3)(B), which requires "reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." Habitat failed to provide a reasonable accommodation for his disability, Schaw asserted, by refusing to consider his food stamps or familial support as income in lieu of wages earned. Second, Schaw alleged that Habitat's minimum-income requirement has a disparate impact on applicants receiving SSDI.

After discovery, the parties filed cross-motions for summary judgment on both claims. Habitat accepted the facts alleged by Schaw and conceded (1) that Schaw is disabled within the meaning of the Act, (2) that Schaw asked Habitat to consider his food stamps and familial support as supplemental income, and (3) that Habitat refused to consider the food stamps and the familial support—other than in the form of a trust or annuity—as income for purposes of his application. Habitat

5

disputed, however, that the accommodation that Schaw requested was "reasonable" within the meaning of the Act.

Shortly after the parties filed their motions, Schaw moved for leave to amend his complaint, seeking to clarify the effect that a trust or annuity would have on his government benefits. At the time he filed the complaint, Schaw believed that a trust or annuity would render him ineligible for SSDI benefits. He then learned that while a trust or annuity wouldn't affect his SSDI, it could risk his eligibility for other needs-based assistance, such as Medicare. Because the district court didn't believe that these changes would affect its analysis as to the relevant questions of law, it declined to address the motion for leave to amend before ruling on the summary-judgment motions.

The district court granted Habitat's motion for summary judgment. The court didn't address the "reasonable[ness]" of Schaw's request, concluding instead that the accommodation wasn't "necessary" within the meaning of the Act because it "went solely to his financial condition—not his disability." The court also concluded that summary judgment was appropriate because Schaw had failed to attempt in good faith to take advantage of Habitat's proposed "alternative accommodation"—namely, to have his father set up familial support in the form of a trust or annuity. As to Schaw's second claim, the court determined that he had

6

failed to provide any evidence that Habitat's requirements had a disparate impact on SSDI recipients.  This appeal followed.

## II

The Fair Housing Amendments Act of 1988 exists "to prohibit discrimination based on handicap and familial status."  *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 (11th Cir. 2008).  As relevant here, discrimination includes refusing "to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a disabled] person equal opportunity to use and enjoy a dwelling."  42 U.S.C. § 3604(f)(3)(B).

To prevail on a failure-to-accommodate claim, a plaintiff must prove (1) that he is disabled, (2) that he requested a "reasonable accommodation," (3) that the requested accommodation was "necessary to afford [him an] equal opportunity to use and enjoy the dwelling," and (4) that the defendant refused to make the requested accommodation.  *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1225–26 (11th Cir. 2016).  The first and last elements are undisputed in this case—no one here disputes that Schaw is disabled or that Habitat refused to accommodate his request that it consider his supplemental sources of income.  Accordingly, we focus on the middle two elements—whether the accommodation that Schaw requested was "reasonable" and whether it was "necessary to afford [him] an equal

7

opportunity to use and enjoy a dwelling." *Id.* at 1225. The district court skipped the first question and decided the case solely on the basis of the second. But because we find that a genuine issue of material fact exists as to both, we will address each in turn.[1]

## A

### 1

First, what do we mean when we talk about a "reasonable accommodation" under the Act? The reasonableness inquiry considers "whether the requested accommodation 'is both efficacious and proportional to the costs to implement it.'" *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1289 (11th Cir. 2014) (quoting *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002)).[2] Assessing reasonableness "require[s] a balancing of the parties' needs." *Id.* An accommodation isn't reasonable if it requires "a fundamental alteration in the nature of a program" or imposes "undue financial and administrative burdens." *Southeastern Comm. Coll. v. Davis*, 442 U.S. 397, 410,

---

[1] We review *de novo* the district court's grant of summary judgment. *Loren v. Sasser*, 309 F.3d 1296, 1301 (11th Cir. 2002) (per curiam) (citation omitted). Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

[2] Although our case law addressing reasonable accommodations under the Fair Housing Amendments Act is rather thin, "Congress imported the reasonable-accommodation concept" from case law interpreting the Americans with Disabilities Act and the Rehabilitation Act. *Schwarz*, 544 F.3d at 1220. Because "we have applied [these] reasonable-accommodation requirements on numerous occasions," we can "look to case law" under the ADA and RA for "guidance on what is reasonable under the [Fair Housing Amendments Act]." *Id.*

412 (1979) (interpreting the term "reasonable accommodation" in the analogous Rehabilitation Act context); *see also Schwarz*, 544 F.3d at 1220. This Court has explained—in imaginative terms—that "[t]he difference between [an] accommodation that is required and [a] transformation that is not is the difference between saddling a camel and removing its hump." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1260 (11th Cir. 2001) (interpreting the term "reasonable accommodation" in the analogous Americans with Disabilities Act context).

A plaintiff carries the initial burden of showing that his proposed accommodation is reasonable; however, on a showing of a facially reasonable request, it's up to the defendant to demonstrate why the requested accommodation would cause undue hardship. *U.S. Airways v. Barnett*, 535 U.S. 391, 401–02 (2002).[3] The Supreme Court has explained that "a plaintiff/employee (to defeat a defendant/employer's motion for summary judgment) need only show that an 'accommodation' seems reasonable on its face, *i.e.,* ordinarily or in the run of cases." *Id*. at 401 (citation omitted). This doesn't necessarily mean that a defendant is required "to accommodate a [plaintiff] in any manner in which that

---

[3] There is, of course, some overlap between these inquiries. But "[t]hat the evidence probative of the issue of whether an accommodation for the [plaintiff] is reasonable will often be similar (or identical) to the evidence probative of the issue whether a resulting hardship for the [defendant] is undue, does not change the fact that establishing that a reasonable accommodation exists is a part of a [FHAA] plaintiff's case, whereas undue hardship is an affirmative defense to be pled and proven by a [FHAA] defendant." *Willis v. Conopco, Inc.*, 108 F.3d 282, 286 (11th Cir. 1997).

[plaintiff] desires." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) (quotation omitted). It does mean, though, that the initial threshold presents a relatively low bar. *See Willis*, 108 F.3d at 286 & n.2 (11th Cir. 1997) ("As a general matter, a reasonable accommodation is one employing a method of accommodation that is reasonable in the run of cases . . . .") (quoting *Barth v. Gelb*, 2 F.3d 1180, 1187 (D.C. Cir. 1993)); *see also Hunt*, 814 F.3d at 1226 (assuming that a mother's request for accommodation was reasonable when she sought an exception to an apartment complex's lease-nonrenewal policy while making arrangements for her disabled son to be placed in offsite care).

If a plaintiff's request is facially reasonable, the burden shifts to the defendant, who must prove that the accommodation would nonetheless impose an "undue burden" or result in a "fundamental alteration" of its program. *Schwarz*, 544 F.3d at 1220. An accommodation requires a "fundamental alteration" if it would "eliminate an 'essential' aspect of the relevant activity," *id.* at 1220–21—or, if you prefer, would "remov[e] [the camel's] hump," *Lucas*, 257 F.3d at 1260. Whether a particular aspect of an activity is "essential" will turn on the facts of each case. *Schwarz*, 544 F.3d at 1221; *see also Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995) ("[T]he determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that

10

considers, among other factors, the effectiveness of the modification . . . and the cost to the organization that would implement it.").

While that may sound a little squishy, we aren't without guidance in this area. In *Schwarz v. City of Treasure Island*, we acknowledged that the Supreme Court had determined that the analogous ADA required the PGA Tour to allow a contestant to use a golf cart rather than walk during a tournament. 544 F.3d at 1221 (discussing *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 689 (2001)). While riding in a golf cart arguably provides an advantage of sorts, the Court explained that the Tour's walking rule was not "an essential rule of competition" but was "at best peripheral to the nature of [its] athletic events." *See Martin*, 532 U.S. at 689.

Another way to look at the "essential"-ness (or "fundamental"-ness) issue might be to ask, "What is the basic purpose of the rule or policy at issue?" In *Schwarz*, we considered a request for a variance to allow several halfway houses— which are classified as tourist-dwellings because of their high turnover rates—to operate, some in a designated single-family residential zone and others in a zone that allowed multi-family dwellings. 544 F.3d at 1205–06. In the process of evaluating the City's defense, we examined the basic purpose of zoning—"to bring complementary land uses together, while separating incompatible ones." *Id*. at 1221. We held that the low-turnover rule embodied in the prohibition on tourist dwellings went to the basic purpose of the single-family zoning restrictions—to

provide quiet, safety, and permanence in single-family residential neighborhoods. *Id*. at 1223. We also concluded, however, that the same rule was not an "essential" aspect of multi-family zones. *Id*. at 1223–24. Despite the City's arguments about traffic congestion, noise, and other potential problems, we determined that allowing short-term recovery homes to operate in multi-family zones didn't effect the same kind of "fundamental alteration" that it would in single-family zones. *Id*. at 1225. *Compare also, e.g*., *Se. Cmty. Coll.*, 442 U.S. at 410 (requiring a nursing school to waive all clinical requirements for a deaf applicant would fundamentally alter the nature of the nursing program), *with, e.g*., *Anderson v. City of Blue Ash*, 798 F.3d 338, 363 (6th Cir. 2015) (allowing a miniature therapy horse to reside in disabled girl's backyard wouldn't necessarily fundamentally alter the nature of single-family neighborhoods).

When evaluating whether an accommodation would impose an undue burden, courts also weigh the respective costs and benefits of the accommodation to the parties, performing a "balancing of the parties' needs." *Bhogaita*, 765 F.3d at 1288 (citation omitted). In *Oconomowoc Residential Programs v. City of Milwaukee*, the Seventh Circuit evaluated a plaintiff's request for a variance from a municipal ordinance restricting community living facilities from operating within 2,500 feet of similar facilities. 300 F.3d at 777. The plaintiff demonstrated the reasonableness of the accommodation by pointing to a shortage of area residential

facilities for brain-injured individuals and to court orders requiring two individuals to be transferred to a group home as soon as possible. *Id*. at 779. Although the City pointed to a slew of potential issues in return, including increased traffic and adverse effects on neighborhood parking, the Court found that none of those inconveniences could be construed as an undue administrative or financial burden. *Id*. at 785–87.

Salute v. Stratford Greens Garden Apartments, 136 F.3d 293 (2d Cir. 1998), is an illustrative decision to the contrary. There, two disabled individuals who qualified for low-income housing assistance under the federal government's "Section 8" program applied for apartments at Stratford Greens. *Id*. at 296. Both were turned away, however, because the apartment manager "d[id] not want to get involved with the federal government and its rules and regulations." *Id*. In response, the applicants filed a complaint under the Fair Housing Amendments Act, alleging that Stratford Greens had discriminated against them by "refusing to make 'reasonable accommodations' to facilitate the rental." *Id*. The Second Circuit determined, though, that "the burden of participating in the Section 8 program" could not be viewed as imposing "only reasonable costs or insubstantial burdens." *Id*. at 301. Requiring an apartment complex to accept Section 8 applicants, the court explained, would impose an undue burden because participation in a federal program "will or may entail" a number of encumbrances,

13

including "financial audits, maintenance requirements, inspection of the premises, reporting requirements, [and] an increased risk of litigation." *Id.* Having to rework its leasing program to accommodate these numerous requirements, the court concluded, would effect "a fundamental alteration" of the complex's rental policies. *Id.*

So, what's the upshot? From these decisions, we glean the following principles. First, a plaintiff need only demonstrate a facially reasonable request— or one that seems reasonable in "the run of cases." *Willis*, 108 F.3d at 286; *Barth*, 2 F.3d at 1187. Second, a defendant may then proffer evidence that the plaintiff's request would nonetheless cause an undue burden or a fundamental alteration of its policy or program. Third, in evaluating the evidence, a court may consider whether the plaintiff's requested accommodation would eliminate an "essential aspect" of the defendant's policy or program or simply inconvenience it, keeping in mind the "basic purpose" of the policy or program at issue, and weighing the benefits to the plaintiff against the burdens on the defendant.

## 2

Back to Schaw. The district court didn't address whether Schaw's requested accommodation was of a type likely to be reasonable in the "run of cases," preferring to grant judgment primarily on the ground that any accommodation was not, within the meaning of the Act, "necessary to afford [him an] equal opportunity

14

to use and enjoy a dwelling." (Much more on necessity below—but reasonableness first.) Let's begin, then, by looking at the nature of Schaw's request: to submit food stamps or familial support in lieu of W-2 income for the purpose of meeting Habitat's minimum-income requirement. Recall that Habitat requires its program applicants to demonstrate a minimum gross annual income of $10,170, or $847.50 per month. Schaw receives a gross annual income of $9,336, or $778 in SSDI per month. He also receives $100 per month in familial support, increasing his gross annual income to $10,536. Factoring in his $194 in food stamps, he brings in a total of $12,864. If Habitat credited *either* the food stamps *or* the familial support, Schaw would meet the minimum-income requirement.

Is Schaw's request that Habitat accept food stamps or familial support toward its minimum-income requirement in lieu of ordinary wages facially "reasonable"? Seems so to us. To be clear, Schaw didn't ask Habitat to lower its minimum-income requirement or to accept any less than usual in terms of payment or interest. Instead, Schaw—who is unable to work—asked Habitat to accept proof that he brings in the same amount of money as any other Habitat homeowner, but in a different form. This request strikes us as the type of accommodation that the Supreme Court has deemed at least facially reasonable. It is more akin, we think, to allowing a golfer to use a cart—completing the essential aspects of the game in a different way—than requiring a nursing program to waive

15

all clinical requirements—removing the essential aspects of a program.  *Compare PGA Tour*, 532 U.S. at 689, *with Se. Cmty. Coll.*, 442 U.S. at 410.  Rather than seeking a waiver of a basic requirement of Habitat's housing program, Schaw asks to meet those basic requirements in his own way.  That seems to us sufficient to meet the relatively low facial-reasonableness bar adopted in *Barnett*.  *See* 535 U.S. at 401–02.

It's a separate question, though—one that we decline to decide in the first instance—whether Habitat can nonetheless demonstrate "special . . . circumstances that demonstrate undue hardship."  *Id.* at 401–02.  Would Schaw's requested accommodation modify a core aspect of Habitat's program (*i.e.*, remove the camel's hump) or merely inconvenience (*i.e.*, saddle) it?  The answer depends on the basic purpose of the income requirement and the relative benefits and burdens to the parties of implementing Schaw's request.  The record indicates that Habitat's requirements exist to ensure an applicant's ability to pay the mortgage.  At least as matters currently stand, we can't say that Schaw's proposal would meaningfully thwart Habitat's minimum-income threshold.  (Consider that the typical at-will employee can't guarantee an ongoing ability to pay, either.)  It's possible, of course, that on closer inspection it will become clear that the accommodation would constitute "a fundamental alteration in the nature" of Habitat's program in another way or impose "undue financial or administrative burdens."  *Schwarz*, 544

16

F.3d at 1218, 1220.  And it's also possible that it won't.  Because the record is silent as to the likely effect of Schaw's request, we think it prudent to remand to allow the district court to determine, in the first instance, whether the accommodation constitutes an undue burden on or fundamental alteration of Habitat's program.

We should clarify one thing before we move on to the "necessity" prong of Schaw's claim.  Although the record is devoid of evidence pertaining to whether Schaw's requested accommodation would impose "undue financial or administrative burdens," the district court held that Habitat was entitled to summary judgment because it had provided a sufficient "*alternative accommodation*" in suggesting that Schaw's father set up a trust or an annuity to disburse the familial-support funds.[4]  The district court suggested, per *Walden v. Centers for Disease Control & Prevention*, 669 F.3d 1277, 1294 (11th Cir. 2012), that "[o]nce Habitat offered a reasonable accommodation to Mr. Schaw, the burden shifted to him to make a good faith attempt to accommodate his needs through the proffered accommodation."  In so holding, the district court erred.  In particular, it

---

[4] What Habitat asks for is essentially a guarantee that Schaw's income will continue.  That's understandable enough—Habitat wants assurance that if it risks accepting an alternate form of income, it will continue to be paid.  But providing "insurance" in the form of a trust or annuity costs money and takes time, and the record does not reflect that Habitat requires the same level of assurance from non-disabled applicants.  We also know—or are told—that trust or annuity payments could negatively affect Schaw's other government-based assistance—specifically, Medicare costs and premiums from which he is currently exempted.  These are facts of the sort that a court might take into consideration when weighing the benefits and burdens to the parties.

17

transposed the proper burden of proof, seemingly confusing the Fair Housing Amendments Act's reasonable-accommodation inquiry with a religious-accommodation inquiry. Whereas *Walden* suggests that in the religious-accommodation context "[a]ny reasonable accommodation by the employer is sufficient to meet its accommodation obligation," 669 F.3d at 1294 (citation omitted), *Barnett* makes clear—as we've explained—that when it comes to reasonable accommodation of a disability, a court at the summary-judgment stage must consider first whether the plaintiff's own requested accommodation "seems reasonable on its face" before turning to consider a defendant's objections and counterproposals, *see* 535 U.S. at 401–02. Accordingly, the district court's alternative holding, shifting to Schaw the burden of proving a good-faith effort to make use of Habitat's proffered alternative accommodation, was premature. The court should have looked first to the reasonableness of *Schaw's* own proposed accommodation before considering any outside evidence.

## B

In addition to showing that he sought a "reasonable accommodation," a plaintiff attempting to prove a failure-to-accommodate claim under the Fair Housing Amendments Act must demonstrate that the requested accommodation was "necessary to afford [him an] equal opportunity to use and enjoy a dwelling."

18

42 U.S.C. § 3604(f)(3)(B).  For clarity's sake, we'll assess the separate-but-related elements of necessity and equality—and how they apply here—one at a time.

**1**

According to our precedent, a "'necessary' accommodation is one that alleviates the effects of a disability."  *Bhogaita*, 765 F.3d at 1288 (citation omitted).  The Fair Housing Amendments Act defines "handicap" (which our caselaw uses interchangeably with the term "disability") as an impairment that "substantially limits one or more of a person's major life activities," 42 U.S.C. § 3602(h), which, according to the implementing regulations, include "walking, seeing, hearing, speaking, breathing, learning and working," 24 C.F.R. § 100.201(b).  So, linking these ideas together, an accommodation is "necessary" if it "alleviates the effects" of an impairment that limits a person's ability to, among other things, walk, see, hear, or work.  The district court here granted summary judgment in Habitat's favor based primarily on this prong, concluding that, because the requested accommodation "went solely to [Schaw's] financial condition—not his disability," it wasn't "necessary" within the meaning of the Act. We find this too simplistic an explanation.

Schaw asserts that the "effect[] of [his] disability" relevant to this case, *Bhogaita*, 765 F.3d at 1288, is his inability to work.  Because of this limitation, Schaw says, his income consists largely of SSDI—a fixed monthly amount.

Schaw contends that because he is unable to work and therefore unable to supplement his SSDI himself, he should be granted an accommodation allowing him to demonstrate additional income in another form: either his food stamps or a notarized letter indicating familial support.  The district court, however, strictly separated Schaw's "financial condition" from his "disability," holding that financially oriented accommodations could not, as a rule, be necessary to alleviate the effect of a disability.  We will address this issue in two parts: (1) whether an accommodation can be necessary, within the meaning of the Act, to alleviate the economic effects of a disability; and (2) whether Schaw has shown that the particular accommodation that he has requested is in fact necessary to alleviate the effect of *his* disability.

In concluding that Schaw's requested accommodation "went solely to his financial condition—not his disability," and thus wasn't "necessary" for purposes of the Act, the district court relied on the Second Circuit's pronouncement in *Salute v. Stratford Greens Garden Apartments* that the Act "addresses the accommodation of handicaps, not the alleviation of economic disadvantages that may be correlated with having handicaps."  136 F.3d at 301.  Not in this Circuit. As we explained in *Bhogaita v. Altamonte Heights Condominium Association*, a "necessary" accommodation is one that alleviates not "handicaps" *per se*, but rather "the *effects* of" those handicaps.  765 F.3d at 1288.  This distinction is

20

important here.  Consider, for example, the HUD Guidelines, which list as an illustrative accommodation an exception to a "no pets" rule for a seeing-eye dog.  *See* 24 C.F.R. § 100.204(b).  In such a case, it's not the handicap itself, but rather the effect of the handicap, that is being accommodated.  Blindness (the handicap) creates an inability to walk around safely (the effect on a major life activity) and thus a need for a waiver of the prohibition on pets (the accommodation).  Likewise, we might say, Schaw's quadriplegia (the handicap) creates an inability to work (the effect on a major life activity) and thus a need for a waiver of the usual type-of-income requirement (the accommodation).  In both instances an accommodation is being provided to alleviate the effects of a disability on a major life activity.

Given the specifics of this case, we think it significant that federal law lists "working" as a major life activity alongside "seeing, hearing, speaking, and walking."  42 U.S.C. § 3602(h); 24 C.F.R. § 100.201(b).  It would be odd, then, if the Act deemed "necessary" those accommodations that "alleviate[] the effects of" an inability to see, hear, speak, or walk, but not those that alleviate the effects of an inability to work.  As even the *Salute* court recognized, "the duty to make reasonable accommodations is framed by the *nature of the particular handicap*." 136 F.3d at 301 (emphasis added).  In *Schwarz*, for instance, we recognized that "the 'need' created by a substance addiction"—the handicap—was "help with

breaking that addiction and maintaining sobriety." 544 F.3d at 1227. With that in mind, we proceeded to examine whether short stays in halfway houses were an accommodation necessary to address that need. *Id.*

Turning to the case before us, the proper question is whether Schaw's inability to meet the minimum-income requirement through wages earned is an "effect" of his quadriplegia—whether there is some causal relationship between the two. Habitat argues that it isn't—that there's no causal connection—and that even under the Ninth Circuit's somewhat similar decision in *Giebeler v. M&B Associates*, 343 F.3d 1143 (9th Cir. 2003), Schaw would lose. We're not so sure. To briefly explain, in *Giebeler*, the plaintiff worked for five years as a psychiatric technician before being diagnosed with AIDS. *Id.* at 1145. After his diagnosis, he sought to rent an apartment for $875 per month, but was refused because he received only around $1200 per month in disability benefits—much less than the requisite three times the rent. *Id.* When the plaintiff's mother—who made plenty—attempted to sign a lease on her son's behalf, the apartment management rejected her on the basis that it didn't allow co-signors. *Id.* The plaintiff sued, and the Ninth Circuit agreed that the request—that his financially qualified mother be allowed to rent the apartment on his behalf—was clearly an accommodation within the meaning of the Act: "*Barnett* indicates that accommodations may adjust for the practical impact of a disability," the court explained, and "not only for the

22

immediate manifestations of the physical or mental impairment giving rise to the disability." *Id*. at 1150, 1154–55.  The court then remanded to the district court for factual findings as to whether the request was reasonable and would provide him an equal opportunity to use and enjoy a dwelling.

To be sure, *Giebeler* is an easier case.  The court there had definitive evidence that the plaintiff was a well-established working professional at the time he contracted HIV, providing a direct causal link between the impairment and the inability to meet the minimum-income requirement.  *See id*. at 1145.  The record here isn't so clear concerning whether Schaw would have been able to meet Habitat's income requirement via wages earned prior to becoming paralyzed—it doesn't tell us his pre-accident salary, or whether he lived independently or paid rent anywhere before the accident.  Complicating the inquiry, Schaw is classified for SSDI purposes as an "adult disabled child"—a designation indicating that, as a recent high-school graduate at the time of his injury, he hadn't yet reached full earning potential.  Accordingly, we're lacking evidence here of the clear causal connection present in *Giebeler*.  We just don't know.[5]

That said, Schaw's complaint alleges that his inability to meet Habitat's minimum-income threshold through W-2 income is a result of his quadriplegia.

---

[5] For a bit of context, though, a person could exceed Habitat's minimum-income requirement by working 40 hours per week at $5.00 per hour, or 20 hours per week at $10.00 per hour.

23

The district court didn't explicitly consider whether that was so; instead, it summarily determined that the requested accommodation "went solely to [Schaw's] financial condition—not his disability." Under our precedent, however, it's clear that an accommodation addressing an inability to demonstrate wages earned *could* in some cases be "necessary"—that is, could "alleviate the effects of a disability." *Bhogaita*, 765 F.3d at 1288. Accordingly, the district court should have considered here whether Schaw's inability to demonstrate the minimum required income through W-2 wages was an effect of his disability.

## 2

Of course, it's not enough that an accommodation be "necessary" in the abstract—the Act pairs the word with the object of providing a disabled person an "equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). Equal, according to one dictionary, means "receiving or entitled to the same treatment or privileges any other individual has or is entitled to." Webster's Third New International Dictionary 766 (2002). According to another, it denotes "having the same status, rights, or opportunities" and "uniform in application or effect; without discrimination on any grounds." Oxford Dictionary of English 591 (3d ed. 2010).

The Supreme Court has clarified that, in this context, our focus should be (in Oxford-speak) on uniformity of "effect" rather than "application," with the end

goal of ensuring that disabled individuals receive the same opportunities as other individuals.  In *U.S. Airways v. Barnett*, the Court explained that "[t]he simple fact that an accommodation would provide a 'preference'—in the sense that it would permit the worker with a disability to violate a rule that others must obey—cannot, in and of itself, automatically show that the accommodation is not 'reasonable.'" 535 U.S. at 398 (discussing accommodations under the analogous ADA standard). Indeed, the Court explained that accommodations are themselves a type of preference, and that such "preferences will sometimes prove necessary to achieve the Act's basic equal opportunity goal."  *Id.* at 397; *see also id.* ("By definition any special 'accommodation' requires . . . different[], *i.e.*, preferential[]" treatment.). As now-Justice Gorsuch explained during his time on the Tenth Circuit, "under the FHA it is sometimes necessary to dispense with formal equality of *treatment* in order to advance a more substantial equality of *opportunity*."  *Cinnamon Hills Youth Crisis Ctr., Inc. v. St. George City*, 685 F.3d 917, 923 (10th Cir. 2012) (emphasis added).

This doesn't mean, of course, that under the Act a person with a disability is entitled to an accommodation that would place him in a *better* position to enjoy a dwelling than a member of the general public.  *See id.* ("[W]hile the FHA requires accommodations necessary to ensure the disabled receive the same housing opportunities as everybody else, it does not require *more or better* opportunities.").

25

As we explained in *Schwarz*, when accommodations "start addressing problems *not caused by a person's handicap*," a handicapped person receives not "an 'equal,' but rather a better opportunity to use and enjoy a dwelling,"—"a preference that the plain language of this statute cannot support."  544 F.3d at 1226 (emphasis added).

The district court here determined that "Schaw's requested accommodation[] went solely to his financial condition—not his disability," and, accordingly, that it would've given him "a *better opportunity*—as opposed to *equal opportunity*—to use and enjoy one of Habitat's dwellings."  But again, we're not so sure.  For one thing, the district court rested its conclusion that the accommodation would provide a "better" opportunity on the flawed premise that it would remedy *only* Schaw's financial status—which, for reasons already explained, may or may not be true.  Moreover, the district court neglected to acknowledge an important nuance— that the "financial" aspect of the accommodation here concerns only the *form* of funding and not the *amount*.   Schaw didn't request, for example, that Habitat lower its minimum-income standards or allow him to get away with doing or paying any less than other applicants.  He stood ready to pay the monthly mortgage in full and to demonstrate a gross annual income exceeding the minimum required level.  He requested only that he—an individual allegedly limited to a fixed income as a result, he says, of his disability—be allowed to prove that income in part

26

through familial support or food stamps, putting him in the same position as an able-bodied person who could (theoretically) increase his income through W-2 wages.  This request—to show an equal income from a different source—could be construed as an invitation to "dispense with formal equality of treatment in order to advance a more substantial equality of opportunity."  *Cinnamon Hills*, 685 F.3d at 923.

Of course, as Habitat points out, we could look at this another way: that Schaw seeks an advantage that other applicants don't enjoy.  For instance, if an able-bodied comparator happened to bring in $778 monthly from his job and $100 in familial support, he too would have been denied a home.  But nothing in the statute indicates that the fact that a theoretical non-disabled person also could potentially benefit from an accommodation renders that accommodation improper.  Again, "[t]he simple fact that an accommodation would provide a 'preference'—in the sense that it would permit the worker with a disability to violate a rule that others must obey—cannot, in and of itself, automatically show that the accommodation is not 'reasonable.'"  *Barnett*, 535 U.S. at 398.  The inquiry is whether the requested accommodation would provide a disabled person an opportunity to enjoy a dwelling that would otherwise—due to his disability—elude him.

\* \* \*

Having (hopefully) provided some clarification regarding failure-to-accommodate claims under the Fair Housing Amendments Act, we think it prudent to remand for the district court to consider whether, in light of this opinion, Schaw has stated a failure-to-accommodate claim—specifically (1) whether Habitat has shown that Schaw's facially reasonable request would nonetheless result in an undue burden on or fundamental alteration to its program and (2) whether the requested accommodation is necessary to afford Schaw an equal opportunity to use and enjoy a dwelling. *See* 42 U.S.C. § 3604(f)(3)(B).

## III

Schaw separately claims that Habitat's minimum-income requirement has a disparate impact on SSDI recipients. Here, we agree with the district court—Schaw fails to state a claim.

In contrast to a disparate-treatment case in which a plaintiff seeks to establish that a defendant had "a discriminatory intent or motive," a plaintiff bringing a disparate-impact claim challenges practices that have a "disproportionately adverse effect" and are otherwise unjustified by a legitimate rationale. *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2513 (2015) (quotation omitted). A plaintiff can demonstrate a discriminatory effect by showing that a policy "makes housing options

28

significantly more restrictive for members of a protected group than for persons outside that group." *Hallmark Developers, Inc. v. Fulton Cty.*, 466 F.3d 1276, 1286 (11th Cir. 2006) (quotations omitted). Evidence demonstrating a "significant discriminatory effect suffices to demonstrate a [prima facie] violation of the Fair Housing Act." *Jackson v. Okaloosa Cty.*, 21 F.3d 1531, 1543 (11th Cir. 1994). That said, it's not enough to show that a few people are affected by a policy—rather, the disparity must be substantial enough to raise an inference of causation. *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1314 (11th Cir. 1994); *see Schwarz*, 544 F.3d at 1218 (holding that a district court correctly rejected a disparate-impact claim because the plaintiff failed to present any relevant comparative evidence).

We needn't go any farther here, because Schaw failed to provide any evidence of discriminatory effect in the district court. Schaw alleged that Habitat's minimum-impact requirement has a disparate impact on persons with disabilities because the requirements make it impossible for a person receiving SSDI to qualify for a home. In response, Habitat provided evidence of numerous applicants receiving SSDI who'd been approved for a Habitat home. Rather than provide any evidence to the contrary, Schaw sought to amend his complaint to clarify that the minimum-income requirement has a disparate impact on "SSDI applicants who receive $847.50 or less in SSDI per month." Still, though, he offered no evidence.

This reverse-engineered claim—tailored specifically to Schaw's particular circumstances—still fails.  Schaw didn't submit any evidence to prove that Habitat's requirements disproportionately exclude those receiving SSDI (no matter the amount) as compared with able-bodied individuals making the same amount of money from non-SSDI sources.  Accordingly, the district court properly found that Schaw failed to state a disparate-impact claim.

## IV

In sum, we hold (1) that a court must first consider whether a plaintiff has shown that a requested accommodation is facially reasonable and then whether a defendant has demonstrated that the accommodation would result in an undue burden or fundamental alteration to its program or policy; (2) that a plaintiff's financial state in any particular case could be unrelated, correlated, or causally related to his disability and that, in some cases, an accommodation with a financial aspect—even one that appears to provide a preference—could be "necessary to afford [an] equal opportunity to use or enjoy a dwelling" within the meaning of the Act; and (3) that Schaw failed to create a genuine issue of material fact as to whether Habitat's minimum-income requirement disproportionately excludes SSDI recipients.

Accordingly, we affirm the district court as to Schaw's disparate-impact claim and vacate and remand the district court's order for further proceedings

30

consistent with this opinion as to Schaw's failure-to-accommodate claim—to determine, perhaps among other issues, whether Habitat has shown that Schaw's facially reasonable accommodation would result in an undue burden or a fundamental alteration to its program and whether Schaw's financial state is a result of his disability such that the requested accommodation is "necessary to afford [him an] equal opportunity to use or enjoy a dwelling."

**AFFIRMED IN PART AND VACATED AND REMANDED IN PART.**