# United States Court of Appeals

### For the Eighth Circuit

_____

No. 21-3503
_____

Suellen Klossner,

*Plaintiff - Appellee*,

v.

IADU Table Mound MHP, LLC,

*Defendant - Appellant*,

Impact MHC Management, LLC,

*Defendant - Appellant*.

------------------------------

United States; Disability Rights Iowa; Lawyers' Committee for Civil Rights Under
Law; MHAction,

*Amici on Behalf of Appellee*.

_____

No. 21-3544
_____

Suellen Klossner,

*Plaintiff - Appellant*,

v.

IADU Table Mound MHP, LLC,

*Defendant - Appellee*,

Impact MHC Management, LLC,

*Defendant - Appellee*.

_____

Appeals from United States District Court
for the Northern District of Iowa - Eastern

_____

Submitted: September 21, 2022
Filed: April 10, 2023

_____

Before COLLOTON, WOLLMAN, and STRAS, Circuit Judges.

_____

COLLOTON, Circuit Judge.

This appeal concerns the scope of a landlord's duty under the Fair Housing Amendments Act of 1988 to make "reasonable accommodations" for the "handicap" of a tenant. The question is whether that duty extends to "accommodating" a tenant's lack of income by accepting a government housing voucher that the landlord otherwise would not accept from a low-income tenant. We conclude that while the statute requires a landlord to make reasonable accommodations that directly ameliorate the handicap of a tenant, the obligation does not extend to alleviating a tenant's lack of money to pay rent. The district court believed that the landlord's position was "facially appealing," but thought itself constrained by a decision of the Supreme Court on a different issue to enter an injunction in favor of the tenant. We respectfully disagree, and therefore vacate the injunction.

-2-

## I.

Suellen Klossner has lived in a mobile-home park in Dubuque, Iowa, since 2009. The park is owned by IADU Table Mound MHP, LLC, which is controlled by Impact MHC Management, LLC. Tenants in the park pay rent for a lot where they can situate a mobile home. Klossner receives income from government programs that she used to pay her rent for ten years. She is unable to work full-time due to psychiatric and physical disabilities.

In 2019, the City of Dubuque approved a measure allowing the local public housing authority to provide residents of mobile-home parks with housing choice vouchers that could be used to supplement their rent payments. Under this voucher program, the federal government provides funds to local public housing agencies, which in turn may distribute them to low-income tenants. As the rent on Klossner's lot increased, she received a voucher and sought to use it to supplement her rent payments, but the companies declined to accept the voucher.

The companies explained that federal law does not require landlords to accept housing choice vouchers, and that Impact declines to do so except in limited circumstances: where state law requires acceptance or where the company has purchased property where a prior owner accepted vouchers from a holdover tenant—a total of approximately forty tenants out of more than twenty thousand under Impact's management. Impact cited the administrative burdens of accepting vouchers, including the obligation to sign a housing assistance payment contract with restrictions on rent amounts and lease terminations, the requirement to meet certain housing quality standards, and the inefficiencies of keeping records and collecting rent when multiple payers are involved.

Klossner sued Impact and IADU Table Mound, alleging that the companies violated the Fair Housing Amendments Act by refusing to accept her voucher. Her theory was that she is a person with a "handicap" under the FHAA, and that the law required the companies to accept the housing voucher as a "reasonable accommodation" that was "necessary" to afford her "equal opportunity to use and enjoy a dwelling." *See* 42 U.S.C. § 3604(f)(3)(B). Klossner requested an injunction requiring the companies to accept her housing choice voucher, and she sought damages for alleged emotional distress. Klossner also brought claims under state law.

The case proceeded to an expedited bench trial on the federal claim only, with the state law claims to be resolved at a later time. The district court ruled that the companies' refusal to accept Klossner's housing voucher violated the FHAA. The court concluded that where a tenant's disability prevents her from working enough to afford rent, the statute may require a landlord to accept a housing choice voucher as a "reasonable accommodation." The court found that if Klossner were not disabled, then she "could work and earn enough money to pay her rent." The court further determined that Klossner's requested accommodation was reasonable, because it would not impose an undue financial or administrative hardship on the companies or fundamentally alter their policy against accepting housing vouchers except in limited circumstances.

As a remedy, the court granted injunctive relief requested by Klossner, and ordered Impact and IADU Table Mound to accept Klossner's housing choice voucher. The court declined to impose damages, explaining that "the law in this area is far from clear," that the companies acted in good faith, and that the companies reached an agreement with Klossner about rent pending the trial.

Impact and IADU Table Mound appeal the district court's order requiring them to accept Klossner's housing voucher. Klossner cross-appeals the district court's refusal to award damages. We have jurisdiction over the companies' appeal from an

interlocutory order of the district court granting an injunction. 28 U.S.C. § 1292(a)(1); R. Doc. 86, at 23-24; *see Williams v. St. Louis Diecasting Co.*, 611 F.2d 1223, 1224 (8th Cir. 1979).

## II.

The FHAA makes it unlawful to discriminate in housing or make unavailable a dwelling "because of a handicap of [a] buyer or renter." 42 U.S.C. § 3604(f)(1)(A). "Handicap" is a "physical or mental impairment which substantially limits one or more of such person's major life activities." *Id.* § 3602(h)(1). And "major life activities" means "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 24 C.F.R. § 100.201(b). The statute prohibits "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(1)(B). Other statutes use the term "disability" rather than "handicap," but as this case involves the FHAA, we will employ the term used in the statute at issue.

On appeal, the companies argue that although the FHAA calls for reasonable accommodations that directly ameliorate the effect of a handicap, the statute does not require a landlord to accommodate a tenant's economic circumstances by accepting housing vouchers. Two leading cases support that view.

In *Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293 (2d Cir. 1998), tenants asked a landlord to accept government housing certificates to assist with rent as a reasonable accommodation for their handicaps under the FHAA. The landlord refused, and the Second Circuit held that the FHAA did not require the landlord to accept the certificates.

The court reasoned that "the duty to make reasonable accommodations is framed by the nature of the particular handicap," and that illustrative accommodations included providing a preferred parking space for tenants with difficulty walking, or lifting a no-pets rule to allow the use of a service dog by a blind person. *Id.* at 301. The court concluded, however, that the tenants in *Salute* sought an accommodation to remedy economic discrimination "that is practiced without regard to handicap," and that the accommodation sought was not "necessary" to afford handicapped persons an "equal opportunity" to use and enjoy a dwelling. *Id.* at 302. The court emphasized that the FHAA "does not elevate the rights of the handicapped poor over the non-handicapped poor," and that "economic discrimination" is "not cognizable as a failure to make a reasonable accommodation" under the FHAA. *Id.*

In *Hemisphere Building Co. v. Village of Richton Park*, 171 F.3d 437 (7th Cir. 1999), a developer of a community designed for tenants using wheelchairs asked a municipality to grant a zoning variance to allow the construction of more structures on a plot of land. The developer argued that the proposed variance was necessary as a "reasonable accommodation" under the FHAA because it would reduce the cost of each housing unit, and thereby alleviate the economic impact of handicaps on prospective tenants who needed inexpensive housing. The village refused to grant a zoning variance, and the developer sued.

The Seventh Circuit concluded that the developer's position would lead to absurd results and rejected it. The court pointed out that if the reasonable accommodation provision required consideration of a tenant's financial situation, then the statute would allow developers not only to ignore zoning laws, but also to obtain a "reasonable accommodation" that suspended a local building code that increased the cost of construction, or a minimum wage law, or regulations for the safety of construction workers. *Id.* at 440.

The statute did not call for these results, the court explained, because the duty of "reasonable accommodation" is limited to modifying rules or policies that hurt handicapped people *by reason of their handicap*, rather than by virtue of circumstances that they share with others, such as limited economic means. *Id.* The court believed, for example, that if the statute meant that a landlord or developer must accommodate poverty caused by handicaps, then it would allow handicapped persons "to claim a real estate tax rebate." *Id.* at 441. The court viewed this as a "radical result" that required "something more than a spinning out of the logical implications of 'reasonable accommodation.'" *Id.*

We conclude that the reasoning of these decisions is sound, and that it forecloses Klossner's claim here. The term "reasonable accommodation" is not defined in the statute, but it was adopted against the backdrop of a predecessor statute, and must be viewed in the context of a law that forbids discrimination "because of a handicap."

The predecessor statute, the Rehabilitation Act of 1973, provided that no otherwise qualified handicapped individual shall be subjected to discrimination under any federal program solely by reason of the person's handicap. 29 U.S.C. § 794 (1973) (current version at 29 U.S.C. § 794). By regulation, a recipient of federal funds was required to make "reasonable accommodation" to the known physical or mental limitations of an otherwise qualified handicapped applicant. 45 C.F.R. § 84.12(a). Congress used equivalent statutory language in the anti-discrimination provision of the FHAA in 1988, and Congress also adopted the regulatory language of "reasonable accommodation." 42 U.S.C. § 3604(f). "[W]hen Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) (plurality opinion); *see Northcross v. Bd. of Educ.*, 412 U.S. 427, 428 (1973) (per curiam). Other decisions have recognized, therefore, that the

term "[r]easonable accommodation is borrowed from case law interpreting the Rehabilitation Act of 1973." *City of Edmonds v. Wash. State Bldg. Code Council*, 18 F.3d 802, 806 (9th Cir. 1994); *see also* H.R. Rep. No. 100-711, at 25 (1988).

Under the Rehabilitation Act, reasonable accommodation was defined to include (1) making facilities accessible to and usable by handicapped persons, and (2) "job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, the provision of readers or interpreters, and other similar actions." 45 C.F.R. § 84.12(b). Judicial decisions preceding enactment of the FHAA established that reasonable accommodations could include such actions as providing an oral aptitude test in place of a written examination for a dyslexic job applicant, *Stutts v. Freeman*, 694 F.2d 666, 668-69 (11th Cir. 1983), allowing a teacher with tuberculosis to assume a job that did not threaten the health of susceptible students, *Arline v. Sch. Bd. of Nassau Cnty.*, 772 F.2d 759, 765 (11th Cir. 1985), or providing additional training, staff assistance, or scheduling flexibility for an employee with epilepsy, *Reynolds v. Brock*, 815 F.2d 571, 572 (9th Cir. 1987).

Consistent with the regulation promulgated under the Rehabilitation Act, these decisions called for accommodations that provided what one court later described as the "direct amelioration of a disability's effect." *Bryant Woods Inn, Inc. v. Howard Cnty.*, 124 F.3d 597, 604 (4th Cir. 1997). Nothing in the law suggested that the duty of "reasonable accommodation" extended to the dissimilar action of alleviating downstream economic effects of a handicap. When Congress adopted the FHAA in 1988, therefore, it acted against a background understanding that the concept of a "reasonable accommodation" was so limited.

Regulations adopted under the FHAA illustrate the same point: a landlord must make an exception to a no-pets policy for a blind person who requires assistance of a seeing eye dog; an apartment manager must modify a "first come first served" policy for allocating parking spaces to accommodate a tenant who is mobility

impaired. 24 C.F.R. § 100.204(b). A landlord's duty to make reasonable accommodations extends to direct amelioration of handicaps, but does not encompass an obligation to accommodate a tenant's "shortage of money," *Salute*, 136 F.3d at 302, and the far-reaching implications that such an obligation would entail. *Hemisphere*, 171 F.3d at 440-41. Indeed, if Klossner's position were accepted, then we see no principled reason why a landlord could not be required in the name of "reasonable accommodation" to reduce monthly rent for an impecunious disabled person. Accepting payment of five fewer dollars per month is no more "fundamental alteration" of a landlord's business than is assuming the cost and administrative changes that come with accepting government housing vouchers.

The district court found the reasoning of *Salute* "facially appealing, especially when it involves the voluntary housing voucher program," but concluded that the decision could not be reconciled with the Supreme Court's later decision in *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002). We conclude that *Barnett* addressed a different question and does not supersede the holdings in *Hemisphere* and *Salute*.

*Barnett* concerned a different statute, the Americans with Disabilities Act, and its prohibition on discrimination in employment. The ADA dictates that an employer may not "discriminate against a qualified individual" with a disability, 42 U.S.C. § 12112(a), and defines a "qualified" person as one who, "with or without reasonable accommodation," can perform the essential functions of the relevant job, *id.* § 12111(8). The statute further provides that "discrimination" includes "not making reasonable accommodations," unless the accommodation would impose an undue hardship on the employer. *Id*. § 12112(b)(5)(A).

*Barnett* held that the duty of reasonable accommodation under the ADA may require an employer to make an exception to a seniority rule that ordinarily is used to allocate employment opportunities. 535 U.S. at 406. In that case, a disabled worker injured his back while working in a cargo-handling position, and he sought

a less physically demanding job in the mailroom. When he learned that two employees senior to him intended to seek the mailroom position, the disabled worker argued that the employer was required to make an exception to the seniority rule as a reasonable accommodation.

The Court rejected the company's position that there was no duty to consider an exception to a "disability-neutral" seniority rule, and that an employer has no obligation to prefer applicants with disabilities over other applicants. *Id.* at 397-98. *Barnett* explained that by definition, a special "accommodation" requires an employer to treat an employee with a disability differently and preferentially: "The simple fact that an accommodation would provide a 'preference'—in the sense that it would permit the worker with a disability to violate a rule that others must obey—cannot, *in and of itself*, automatically show that the accommodation is not 'reasonable.'" *Id.* at 398.

*Barnett*, however, does not resolve whether a landlord is obliged under the FHAA to "accommodate" a tenant's lack of sufficient money to pay rent. We do not conclude that preferential treatment for a handicapped tenant, in and of itself, takes a proposed accommodation outside the scope of what the FHAA may require. Consistent with *Barnett*, there is no dispute here that the FHAA sometimes requires a landlord to provide preferential treatment: a disability-neutral rule on pets or parking spaces must yield when a tenant requires a service dog or proximity to an entrance.

The issue here, like in *Salute* and *Hemisphere*, is whether the duty of reasonable accommodation goes further and extends to measures that would alleviate a disabled tenant's impoverished economic circumstances. *Barnett* did not address that question. That case involved a potential accommodation that would have directly ameliorated an employee's inability to work in cargo-handling by placing him in a mailroom job, and it addressed a different statute outside the context of housing. We

think the Ninth Circuit in *Giebeler v. M & B Associates*, 343 F.3d 1143 (9th Cir. 2003), overstated the meaning of *Barnett* by presuming that it dictates the ambitious interpretation of the FHAA that was rejected in *Hemisphere* and *Salute*, despite what *Giebeler* termed the "facial appeal" of those decisions. *Id*. at 1154.

\*　　　\*　　　\*

For these reasons, we vacate the injunction ordered by the district court. R. Doc. 82, at 24. The cross-appeal is dismissed for lack of jurisdiction.

STRAS, Circuit Judge, concurring in the judgment.

Sometimes simpler is better, and this is one of those times. *See* Paul Vincent Spade & Claude Panaccio, *William of Ockham*, The Stanford Encyclopedia of Philosophy § 4.1 (Spring 2019 ed.) (describing Ockham's Razor). The court makes multiple assumptions on the way to holding that a housing voucher is not an "accommodation" under the Fair Housing Amendments Act of 1988. I would take a simpler route and just conclude that the request is unreasonable. *See* 42 U.S.C. § 3604(f)(3)(B) (requiring any "accommodation[]" in "rules, policies, practices, or services" to be "reasonable").

Complying with regulations can be a burden. To participate in the housing-voucher program, landlords must be willing to *guarantee* "certain housing[-]quality standards," sign a contract containing "restrictions on rent amounts and lease terminations," and keep an entirely separate set of books. *Ante*, at 3. For those already willing to take housing vouchers, accepting a few more is not a big deal. But for those that are not, like IADU and Impact, it is unreasonable to force the regulatory burdens on them. *See* 42 U.S.C. § 3604(f)(3)(B); *see also Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293, 297–98, 300 (2d Cir. 1998) (explaining why it is "unreasonable").

-11-

The burdens here are even greater than usual. Typically, a landlord owns *both* the unit and the piece of land underneath it. But mobile homes are different. The tenant purchases the trailer and then parks it in a space owned by the landlord.

When it comes to housing vouchers, the split in ownership has real consequences. The quality standards apply primarily to the home itself. *See* 24 C.F.R. § 982.401(c)(2)(i), (f)(1), (g)(2)(i), (m)(1) (requiring, for example, a "sanitary" unit free from "serious defects" that has all "fixtures" and "equipment" in "proper operating condition"). And as its owner, Klossner recognizes that it is her obligation to "complete [the] necessary repairs." But if she falls short, it is IADU and Impact that will bear the brunt of the harm by not getting paid, regardless of who is to blame. *See* 24 C.F.R. § 982.404 (explaining that payments will be "terminate[d]"). Requiring a landlord to shoulder the financial risk in these circumstances is a "major adjustment" to the landlord-tenant relationship. *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 412–13 (1979) (concluding that "major adjustments" are "unreasonable"); *see Ala. Ass'n of Realtors v. DHS*, 141 S. Ct. 2485, 2489 (2021) (noting that the right to exclude—especially those who cannot pay rent—is a "fundamental element[] of property ownership"); *Heights Apartments, LLC v. Walz*, 30 F.4th 720, 735 (8th Cir. 2022) (same).

It is true that landlords can try to evict residents who neglect their units. But going to court costs time and money. *See* 24 C.F.R. § 982.310(f) ("The owner may only evict the tenant from the unit by instituting a court action."). And the housing-voucher regulations may make that option even more burdensome and unpredictable than usual. Eviction is only for "good cause," meaning that severing ties with residents is not always easy. *Id.* § 982.310(a), (d). "[D]epriving [landlords like IADU and Impact] of rent payments with no guarantee of eventual recovery" is a significant and unreasonable risk to place on them. *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489.

-12-

Klossner cites nothing suggesting otherwise. In *Giebeler v. M & B Associates*, for example, the requested accommodation was allowing a resident's mother, who possessed "significant assets," to cosign on the lease as a way of meeting a minimum-income requirement. 343 F.3d 1143, 1144–45, 1158 (9th Cir. 2003). Waiving the no-cosigners policy was a "reasonable accommodation" because it did not "alter the essential obligations" of the relationship or create "substantial financial . . . risk." *Id.* at 1157–58. Not true here.

*Schaw v. Habitat for Humanity of Citrus County, Inc.*, is no different. 938 F.3d 1259 (11th Cir. 2019). The question there was whether a landlord had to count monthly payments from family and food stamps as income. *Id.* at 1268. The court concluded that the answer was yes, but it also explained, in a passage that is relevant here, that the forced acceptance of housing vouchers is an example of an *unreasonable* accommodation. *Id.* at 1267. Faced with that precise situation today, I agree.

In the end, Klossner simply asks too much of IADU and Impact. Forcing them to accept a housing voucher is not a "reasonable" accommodation. 42 U.S.C. § 3604(f)(3)(B). I would not say "a single word more," *United States v. Treanton*, 57 F.4th 638, 643 (8th Cir. 2023) (Stras, J., concurring), particularly if it means undertaking the needlessly complicated task of trying to evaluate how tight the fit is between a disability and an accommodation, *see Rotkiske v. Klemm*, 140 S. Ct. 355, 361 (2019) (decrying "[a]textual judicial supplementation" of a statute).

_____